UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

Mark A. Winger                  )
                                )
_____       )
                                )
        Plaintiff,              )
                                )
        vs.                     )        No. 06-1226
                                )        (Supplied by Clerk)
Guy Pierce , et al.             )
                                )
                                )
_____       )
                                )
        Defendant(s).           )

**FILED**

AUG 3 1 2006

JOHN M. WATERS, Clerk
U.S. DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA, IL

## PETITION AND AFFIDAVIT FOR LEAVE TO PROCEED
## WITHOUT PREPAYMENT OF FEES AND COSTS

I, Mark A. Winger            , plaintiff, move the court for
leave to proceed without prepayment of fees and costs in the above
action.  I declare under penalty of perjury that the following facts
are true:

1.  I am the party initiating this action and I believe I am
entitled to redress.

2.  I am unable to prepay the fees and costs of this
proceeding, or to give security, because of my poverty.

3.  I am (check one)  Single ____   Married ____   Separated ____
Divorced  X

4.  My responses to the following questions are true:

A.  Are you presently employed in any capacity including a
paying position while incarcerated as an inmate in a correctional
center?  Yes (  )  No ( X )

B.  If so, by whom, what is your position, and what is your
pay?

_____

_____

C.  If not, when were you last employed and what was your pay?
This includes prior inmate positions?

August 23rd, 2001, Illinois Department of Nuclear
Safety, Approx. $72,000 per year.

1

D.  Have you received money from any other source, including judgments, in the last 6 months? Yes (✗) No (  ) If yes, describe each source and state how much you received.

My mother ~~sent~~ sent me about $50.00 per month. Occasionally a friend with send about $20.00

E.  If you are presently incarcerated, how much money do you have in your institutional trust fund account?  $844.96 as of 6-30-06

F.  If withdrawals were made from your institutional trust fund account during the past 6 months, please explain when, how much, and the purpose for which funds were used.

I have spent money on heigine products each month. Also, I've bought books for myself and as gifts for my children. Furthermore, I've spent money on postage and photocopies, and legal supplies.

G.  How much money do you have in private checking or saving accounts?  ZERO

H.  Do you own any real estate, stocks, bonds, notes, automobiles, or other valuable property, including audio visual equipment such as T.V.s, stereos, etc. (except for ordinary household furniture and clothing)? Yes (  ) No (✗)

If yes, describe the property and its approximate value:

I own a $14.85 radio bought through the prison commissary.

I.  Do you have any debts or obligations? Yes (✗) No (  )

If yes, list the amount owed, to whom, and any current payments that you are making.

At least $5000 in credit cards, $180 (something),000 to the bank who foreclosed on my home. Child support, back pay. $150,000 loan to my parents.

J.  List your dependents, state your relationship to them, and state how much you contribute to their support each month. Also, state how long you have contributed to that support and other means by which your dependents receive support.

I am the father of Bailey, Anna Margaret, and Benjamin Winger. My adjusted child support monthly payments are approximately $345.00 per month. I have not been able

*to contribute to their support, except for an occasional book gift.*

K. Estimate the total amount of income or support that your dependents receive per month on the average, excluding your contributions to them.

*approx. $200/month from my parents and about $1000/month from Social Security = Approximately 1200/month. I do not know my ex-wife's income.*

I declare under penalty of perjury and fine that the foregoing is true and correct and that I have a continuing duty to advise the court of any changes in my financial position as stated above.

SIGNATURE

DATE  *June 30th, 2006*

3

## CERTIFICATE

(TO BE COMPLETED FOR PRISONERS ONLY.   THIS IS A STATEMENT BY THE
PRISON AND NOT THE PRISONER.)

I hereby certify that the plaintiff or petitioner in this
action has the sum of $ _632 73_ in his trust account at the
correctional center where he is confined.  I further certify that the
plaintiff or petitioner has the following securities to his credit
according to the records of this institution:

_Not Known_

_____

_____

(Authorized Officer)

(Institution) _Tamms CC_

(Title) _Acct Ted I_

DATE **RECEIVED**

JUL 1 1 2005

IMPORTANT:
THIS CERTIFICATE MUST BE ACCOMPANIED BY A COPY OF A SIX-MONTH LEDGER
OF THE PLAINTIFF'S TRUST FUND ACCOUNT. TAMMS CLERK OFFICER
TRUST OFFICE

4

# Pontiac Correctional Center
## Trust Fund
### Inmate Transaction Statement

REPORT CRITERIA - Date: 01/01/2006 thru End;    Inmate: K97120;    Active Status Only ? : No;    Print Restrictions ? : Yes;
Transaction Type: All Transaction Types;    Print Furloughs / Restitutions ? : Yes;    Include Inmate Totals ? : Yes;    Print
Balance Errors Only ? : No

| Inmate: K97120 Winger, Mark A. | | | Housing Unit: PON-E -07-21 | | | Transferred | |
| --- | --- | --- | --- | --- | --- | --- | --- |

| Date | Source | Transaction Type | Batch | Reference # | Description | Amount | Balance |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | | Beginning Balance: | | 881.28 |
| 01/04/06 | Point of Sale | 60 Commissary | 004745 | 204481 | Commissary | -15.40 | 865.88 |
| 01/10/06 | Mail Room | 01 MO/Checks (Not Held) | 010225 | 1459441889 | Winger, Sallie | 50.00 | 915.88 |
| 01/13/06 | Disbursements | 88 4 Books | 013320 | Chk #58120 | 01/13/06, Edward R. Hamilton, Inv. Date: 01/13/2006 | -37.30 | 878.58 |
| 01/17/06 | Disbursements | 84 Library | 017320 | Chk #58122 | 455779, DOC - Library Copies, Inv. Date: 01/04/2006 | -.40 | 878.18 |
| 01/17/06 | Disbursements | 84 Library | 017320 | Chk #58122 | 453286, DOC - Library Copies, Inv. Date: 12/15/2005 | -.40 | 877.78 |
| 01/17/06 | Disbursements | 84 Library | 017320 | Chk #58122 | 456986, DOC - Library Copies, Inv. Date: 01/13/2006 | -.60 | 877.18 |
| 01/17/06 | Disbursements | 80 Postage | 017320 | Chk #58123 | 456486, Pitney Bowes Bank, Inc, Inv. Date: 01/09/2006 | -.87 | 876.31 |
| 01/17/06 | Disbursements | 81 Legal Postage | 017320 | Chk #58123 | 457043, Pitney Bowes Bank, Inc, Inv. Date: 01/13/2006 | -.26 | 876.05 |
| 01/17/06 | Disbursements | 80 Postage | 017320 | Chk #58124 | 454292, DOC: 523 Fund Reimburs, Inv. Date: 12/21/2005 | -.37 | 875.68 |
| 01/17/06 | Disbursements | 81 Legal Postage | 017320 | Chk #58124 | 454314, DOC: 523 Fund Reimburs, Inv. Date: 12/21/2005 | -.60 | 875.08 |
| 01/17/06 | Disbursements | 81 Legal Postage | 017320 | Chk #58124 | 455810, DOC: 523 Fund Reimburs, Inv. Date: 01/04/2006 | -.60 | 874.48 |
| 01/17/06 | Disbursements | 80 Postage | 017320 | Chk #58124 | 455113, DOC: 523 Fund Reimburs, Inv. Date: 12/29/2005 | -.60 | 873.88 |
| 01/17/06 | Disbursements | 80 Postage | 017320 | Chk #58124 | 453909, DOC: 523 Fund Reimburs, Inv. Date: 12/21/2005 | -.37 | 873.51 |
| 01/17/06 | Disbursements | 80 Postage | 017320 | Chk #58124 | 454384, DOC: 523 Fund Reimburs, Inv. Date: 12/21/2005 | -1.11 | 872.40 |
| 01/17/06 | Disbursements | 80 Postage | 017320 | Chk #58124 | 454293, DOC: 523 Fund Reimburs, Inv. Date: 12/21/2005 | -.37 | 872.03 |
| 01/17/06 | Disbursements | 90 Medical Co-Pay | 017320 | Chk #58124 | 454995, DOC: 523 Fund Reimburs, Inv. Date: 12/28/2005 | -2.00 | 870.03 |
| 01/17/06 | Disbursements | 80 Postage | 017320 | Chk #58124 | 456018, DOC: 523 Fund Reimburs, Inv. Date: 01/05/2006 | -.83 | 869.20 |
| 01/17/06 | Disbursements | 80 Postage | 017320 | Chk #58124 | 456171, DOC: 523 Fund Reimburs, Inv. Date: 01/06/2006 | -.83 | 868.37 |
| 01/25/06 | Mail Room | 01 MO/Checks (Not Held) | 025262 | 08605357121 | Suhling, Diane | 20.00 | 888.37 |
| 01/31/06 | Disbursements | 84 Library | 031320 | Chk #58316 | 458363, DOC - Library Copies, Inv. Date: 01/27/2006 | -.40 | 887.97 |
| 01/31/06 | Disbursements | 84 Library | 031320 | Chk #58316 | 457629, DOC - Library Copies, Inv. Date: 01/20/2006 | -1.00 | 886.97 |
| 01/31/06 | Disbursements | 80 Postage | 031320 | Chk #58317 | 457727, Pitney Bowes Bank, Inc, Inv. Date: 01/20/2006 | -.39 | 886.58 |
| 01/31/06 | Disbursements | 80 Postage | 031320 | Chk #58317 | 457491, Pitney Bowes Bank, Inc, Inv. Date: 01/19/2006 | -.63 | 885.95 |
| 02/01/06 | Mail Room | 01 MO/Checks (Not Held) | 032225 | 1459344125 | Winger, Sallie | 50.00 | 935.95 |
| 02/03/06 | Point of Sale | 60 Commissary | 034776 | 207128 | Commissary | -15.02 | 920.93 |
| 02/28/06 | Disbursements | 84 Library | 059320 | Chk #58413 | 460177, DOC: Library Copies, Inv. Date: 02/15/2006 | -.55 | 920.38 |
| 02/28/06 | Disbursements | 84 Library | 059320 | Chk #58413 | 461144, DOC: Library Copies, Inv. Date: 02/23/2006 | -5.10 | 915.28 |
| 02/28/06 | Disbursements | 84 Library | 059320 | Chk #58413 | 461436, DOC: Library Copies, Inv. Date: 02/27/2006 | -3.20 | 912.08 |
| 02/28/06 | Disbursements | 81 Legal Postage | 059320 | Chk #58414 | 461049, DOC: 523 Fund Reimburs, Inv. Date: 02/22/2006 | -1.59 | 910.49 |
| 02/28/06 | Disbursements | 81 Legal Postage | 059320 | Chk #58415 | 461255, Pitney Bowes Bank, Inc, Inv. Date: 02/23/2006 | -1.11 | 909.38 |

Date: 7/7/2006
Time: 2:49pm

d_list_inmate_trans_statement_composite

1:06-cv-01226-HAB-JAG    # 1    Page 6 of 9

Page 2

**Pontiac Correctional Center**
**Trust Fund**

Inmate Transaction Statement

REPORT CRITERIA - Date: 01/01/2006 thru End;     Inmate: K97120;     Active Status Only ? : No;     Print Restrictions ? : Yes;
Transaction Type: All Transaction Types;     Print Furloughs / Restitutions ? : Yes;     Include Inmate Totals ? : Yes;     Print
Balance Errors Only ? : No

**Inmate: K97120 Winger, Mark A.**         **Housing Unit: PON-E -07-21**         **Transferred**

| Date | Source | Transaction Type | Batch | Reference # | Description | Amount | Balance |
|------|--------|------------------|-------|-------------|-------------|--------|---------|
| 02/28/06 | Disbursements | 80 Postage | 059320 | Chk #58415 | 460631, Pitney Bowes Bank, Inc, Inv. Date: 02/21/2006 | -.39 | 908.99 |
| 02/28/06 | Disbursements | 81 Legal Postage | 059320 | Chk #58415 | 458934, Pitney Bowes Bank, Inc, Inv. Date: 02/02/2006 | -.63 | 908.36 |
| 02/28/06 | Disbursements | 80 Postage | 059320 | Chk #58415 | 459115, Pitney Bowes Bank, Inc, Inv. Date: 02/03/2006 | -.39 | 907.97 |
| 02/28/06 | Disbursements | 80 Postage | 059320 | Chk #58415 | 458857, Pitney Bowes Bank, Inc, Inv. Date: 02/01/2006 | -.63 | 907.34 |
| 03/03/06 | Point of Sale | 60 Commissary | 062703 | 209215 | Commissary | -15.64 | 891.70 |
| 03/14/06 | Disbursements | 84 Library | 073320 | Chk #58490 | 463298, DOC - Library Copies, Inv. Date: 03/14/2006 | -.90 | 890.80 |
| 03/14/06 | Disbursements | 84 Library | 073320 | Chk #58490 | 462924, DOC - Library Copies, Inv. Date: 03/10/2006 | -.20 | 890.60 |
| 03/14/06 | Disbursements | 84 Library | 073320 | Chk #58490 | 462271, DOC - Library Copies, Inv. Date: 03/07/2006 | -7.50 | 883.10 |
| 03/14/06 | Disbursements | 84 Library | 073320 | Chk #58490 | 462106, DOC - Library Copies, Inv. Date: 03/02/2006 | -5.60 | 877.50 |
| 03/14/06 | Disbursements | 90 Medical Co-Pay | 073320 | Chk #58492 | 462117, DOC: 523 Fund Reimburs, Inv. Date: 03/03/2006 | -2.00 | 875.50 |
| 03/14/06 | Disbursements | 80 Postage | 073320 | Chk #58493 | 462496, Pitney Bowes Bank, Inc, Inv. Date: 03/07/2006 | -.39 | 875.11 |
| 03/14/06 | Disbursements | 80 Postage | 073320 | Chk #58493 | 462704, Pitney Bowes Bank, Inc, Inv. Date: 03/08/2006 | -.39 | 874.72 |
| 03/14/06 | Disbursements | 80 Postage | 073320 | Chk #58493 | 462419, Pitney Bowes Bank, Inc, Inv. Date: 03/07/2006 | -.39 | 874.33 |
| 03/14/06 | Disbursements | 81 Legal Postage | 073320 | Chk #58493 | 462157, Pitney Bowes Bank, Inc, Inv. Date: 03/03/2006 | -5.15 | 869.18 |
| 03/14/06 | Disbursements | 81 Legal Postage | 073320 | Chk #58493 | 462380, Pitney Bowes Bank, Inc, Inv. Date: 03/08/2006 | -1.35 | 867.83 |
| 03/17/06 | Disbursements | 88 Books | 076320 | Chk #58638 | 03/17/06, Dover Publications, , Inv. Date: 03/17/2006 | -46.85 | 820.98 |
| 03/21/06 | Mail Room | 01 MO/Checks (Not Held) | 080262 | 1459350256 | Winger, Sallie | 50.00 | 870.98 |
| 03/27/06 | Disbursements | 84 Library | 086320 | Chk #58780 | 464131, DOC - Library Copies, Inv. Date: 03/21/2006 | -.45 | 870.53 |
| 03/27/06 | Disbursements | 84 Library | 086320 | Chk #58780 | 464283, DOC - Library Copies, Inv. Date: 03/22/2006 | -.10 | 870.43 |
| 03/27/06 | Disbursements | 80 Postage | 086320 | Chk #58795 | 464475, Pitney Bowes Bank, Inc, Inv. Date: 03/23/2006 | -.39 | 870.04 |
| 03/27/06 | Disbursements | 81 Legal Postage | 086320 | Chk #58795 | 464192, Pitney Bowes Bank, Inc, Inv. Date: 03/21/2006 | -.63 | 869.41 |
| 03/27/06 | Disbursements | 80 Postage | 086320 | Chk #58795 | 463842, Pitney Bowes Bank, Inc, Inv. Date: 03/17/2006 | -.24 | 869.17 |
| 03/27/06 | Disbursements | 81 Legal Postage | 086320 | Chk #58795 | 464444, Pitney Bowes Bank, Inc, Inv. Date: 03/23/2006 | -.63 | 868.54 |
| 03/29/06 | Disbursements | 88 Books | 088320 | Chk #58890 | 03/28/06, Dover Publications, , Inv. Date: 03/28/2006 | -11.90 | 856.64 |
| 04/03/06 | Point of Sale | 60 Commissary | 093745 | 211412 | Commissary | -13.85 | 842.79 |
| 04/07/06 | Disbursements | 84 Library | 097320 | Chk #59060 | 465199, DOC: Library Copies, Inv. Date: 03/30/2006 | -.30 | 842.49 |
| 04/07/06 | Disbursements | 80 Postage | 097320 | Chk #59061 | 465580, Pitney Bowes Bank, Inc, Inv. Date: 04/03/2006 | -.39 | 842.10 |
| 04/07/06 | Disbursements | 80 Postage | 097320 | Chk #59061 | 465581, Pitney Bowes Bank, Inc, Inv. Date: 04/03/2006 | -.41 | 841.69 |
| 04/07/06 | Disbursements | 81 Legal Postage | 097320 | Chk #59061 | 465721, Pitney Bowes Bank, Inc, Inv. Date: 04/04/2006 | -.63 | 841.06 |

Date: 7/7/2006
Time: 2:49pm

1:06-cv-01226-HAB-JAG    # 1    Page 7 of 9

Page 3

**Pontiac Correctional Center**
**Trust Fund**
Inmate Transaction Statement

d_list_inmate_trans_statement_composite

REPORT CRITERIA - Date: 01/01/2006 thru End;    Inmate: K97120;    Active Status Only ? : No;    Print Restrictions ? : Yes;
Transaction Type: All Transaction Types;    Print Furloughs / Restitutions ? : Yes;    Include Inmate Totals ? : Yes;    Print
Balance Errors Only ? : No

| Inmate: K97120 Winger, Mark A. | | | | | Housing Unit: PON-E -07-21 | | **Transferred** |
|---|---|---|---|---|---|---|---|
| Date | Source | Transaction Type | Batch | Reference # | Description | Amount | Balance |
| 04/07/06 | Disbursements | 80 Postage | 097320 | Chk #59061 | 465997, Pitney Bowes Bank, Inc, Inv. Date: 04/05/2006 | -6.63 | 834.43 |
| 04/19/06 | Mail Room | 01 MO/Checks (Not Held) | 109262 | 1459250382 | Winger, Sallie | 50.00 | 884.43 |
| 04/21/06 | Disbursements | 88 Books | 111320 | Chk #59203 | 04/21/06, Dover Publications, , Inv. Date: 04/21/2006 | -35.85 | 848.58 |
| 04/25/06 | Disbursements | 84 Library | 115320 | Chk #59207 | 467601, DOC: Library Copies, Inv. Date: 04/20/2006 | -.30 | 848.28 |
| 04/25/06 | Disbursements | 81 Legal Postage | 115320 | Chk #59209 | 466613, Pitney Bowes Bank, Inc, Inv. Date: 04/11/2006 | -.63 | 847.65 |
| 04/25/06 | Disbursements | 81 Legal Postage | 115320 | Chk #59209 | 466602, Pitney Bowes Bank, Inc, Inv. Date: 04/11/2006 | -.87 | 846.78 |
| 05/05/06 | Point of Sale | 60 Commissary | 125703 | 214352 | Commissary | -16.34 | 830.44 |
| 05/08/06 | Point of Sale | 60 Commissary | 128703 | 214458 | Commissary | 1.34 | 831.78 |
| 05/10/06 | Disbursements | 84 Library | 130320 | Chk #59320 | 469486, DOC - Library Copies, Inv. Date: 05/08/2006 | -.30 | 831.48 |
| 05/10/06 | Disbursements | 84 Library | 130320 | Chk #59320 | 468563, DOC - Library Copies, Inv. Date: 05/01/2006 | -.10 | 831.38 |
| 05/10/06 | Disbursements | 84 Library | 130320 | Chk #59320 | 469267, DOC - Library Copies, Inv. Date: 05/05/2006 | -.85 | 830.53 |
| 05/10/06 | Disbursements | 84 Library | 130320 | Chk #59320 | 468807, DOC - Library Copies, Inv. Date: 05/02/2006 | -.10 | 830.43 |
| 05/10/06 | Disbursements | 81 Legal Postage | 130320 | Chk #59323 | 468640, Pitney Bowes Bank, Inc, Inv. Date: 05/01/2006 | -.39 | 830.04 |
| 05/10/06 | Disbursements | 81 Legal Postage | 130320 | Chk #59323 | 469924, Pitney Bowes Bank, Inc, Inv. Date: 05/10/2006 | -.39 | 829.65 |
| 05/10/06 | Disbursements | 81 Legal Postage | 130320 | Chk #59323 | 469902, Pitney Bowes Bank, Inc, Inv. Date: 05/10/2006 | -.87 | 828.78 |
| 05/10/06 | Disbursements | 81 Legal Postage | 130320 | Chk #59323 | 468641, Pitney Bowes Bank, Inc, Inv. Date: 05/01/2006 | -.39 | 828.39 |
| 05/10/06 | Disbursements | 80 Postage | 130320 | Chk #59323 | 468902, Pitney Bowes Bank, Inc, Inv. Date: 05/02/2006 | -.63 | 827.76 |
| 05/10/06 | Disbursements | 81 Legal Postage | 130320 | Chk #59323 | 469925, Pitney Bowes Bank, Inc, Inv. Date: 05/10/2006 | -.39 | 827.37 |
| 05/10/06 | Disbursements | 80 Postage | 130320 | Chk #59323 | 468901, Pitney Bowes Bank, Inc, Inv. Date: 05/02/2006 | -1.35 | 826.02 |
| 05/16/06 | Mail Room | 01 MO/Checks (Not Held) | 136262 | 1459349869 | Winger, Sallie | 50.00 | 876.02 |
| 05/23/06 | Point of Sale | 60 Commissary | 143731 | 216049 | Commissary | -14.78 | 861.24 |
| 05/30/06 | Disbursements | 84 Library | 150320 | Chk #59522 | 472046, DOC: Library Copies, Inv. Date: 05/30/2006 | -.15 | 861.09 |
| 05/30/06 | Disbursements | 80 Postage | 150320 | Chk #59525 | 470881, Pitney Bowes Bank, Inc, Inv. Date: 05/16/2006 | -.39 | 860.70 |
| 05/30/06 | Disbursements | 80 Postage | 150320 | Chk #59525 | 471993, Pitney Bowes Bank, Inc, Inv. Date: 05/26/2006 | -.39 | 860.31 |
| 05/30/06 | Disbursements | 81 Legal Postage | 150320 | Chk #59525 | 471372, Pitney Bowes Bank, Inc, Inv. Date: 05/22/2006 | -.39 | 859.92 |
| 05/30/06 | Disbursements | 80 Postage | 150320 | Chk #59525 | 471043, Pitney Bowes Bank, Inc, Inv. Date: 05/17/2006 | -1.59 | 858.33 |
| 05/30/06 | Disbursements | 80 Postage | 150320 | Chk #59525 | 470400, Pitney Bowes Bank, Inc, Inv. Date: 05/11/2006 | -.39 | 857.94 |
| 05/30/06 | Disbursements | 80 Postage | 150320 | Chk #59525 | 472189, Pitney Bowes Bank, Inc, Inv. Date: 05/30/2006 | -.87 | 857.07 |
| 05/30/06 | Disbursements | 80 Postage | 150320 | Chk #59525 | 472190, Pitney Bowes Bank, Inc, Inv. Date: 05/30/2006 | -1.35 | 855.72 |
| 06/14/06 | Mail Room | 01 MO/Checks (Not Held) | 165262 | 1459349946 | Winger, Sallie | 50.00 | 905.72 |
| 06/15/06 | Disbursements | 84 Library | 166320 | Chk #59722 | 473764, DOC - Library Copies, Inv. Date: 06/14/2006 | -.10 | 905.62 |

# Pontiac Correctional Center
## Trust Fund
### Inmate Transaction Statement

REPORT CRITERIA - Date: 01/01/2006 thru End;    Inmate: K97120;    Active Status Only ? : No;    Print Restrictions ? : Yes;
Transaction Type: All Transaction Types;    Print Furloughs / Restitutions ? : Yes;    Include Inmate Totals ? : Yes;    Print
Balance Errors Only ? : No

**Inmate: K97120 Winger, Mark A.**    **Housing Unit: PON-E -07-21**    **Transferred**

| Date | Source | Transaction Type | Batch | Reference # | Description | Amount | Balance |
|------|--------|------------------|-------|-------------|-------------|--------|---------|
| 06/15/06 | Disbursements | 80 Postage | 166320 | Chk #59725 | 473524, Pitney Bowes Bank, Inc, Inv. Date: 06/12/2006 | - 87 | 904.75 |
| 06/15/06 | Disbursements | 80 Postage | 166320 | Chk #59725 | 472431, Pitney Bowes Bank, Inc, Inv. Date: 05/31/2006 | -.24 | 904.51 |
| 06/15/06 | Disbursements | 80 Postage | 166320 | Chk #59725 | 473144, Pitney Bowes Bank, Inc, Inv. Date: 06/07/2006 | -2.07 | 902.44 |
| 06/15/06 | Disbursements | 81 Legal Postage | 166320 | Chk #59725 | 473005, Pitney Bowes Bank, Inc, Inv. Date: 06/06/2006 | -.63 | 901.81 |
| 06/15/06 | Disbursements | 80 Postage | 166320 | Chk #59725 | 473865, Pitney Bowes Bank, Inc, Inv. Date: 06/14/2006 | -4.05 | 897.76 |
| 06/16/06 | Disbursements | 88 Books | 167320 | Chk #59780 | 06/16/06, Dover Publications, , Inv. Date: 06/16/2006 | -52.80 | 844.96 |
| 06/23/06 | Disbursements | 99 Transfer Inmate | 174320 | Chk #59843 | Tamms CC, Inv. Date: 06/23/2006 | -844.96 | .00 |

| | |
|---|---|
| Total Inmate Funds: | .00 |
| Less Funds Held For Orders: | .00 |
| Less Funds Restricted: | .00 |
| Funds Available: | .00 |
| Total Furloughs: | .00 |
| Total Voluntary Restitutions: | .00 |

# Tamms Correctional Center
## Trust Fund

### Inmate Transaction Statement

REPORT CRITERIA - Date: Start thru End;     Inmate: K97120;     Active Status Only ? : No;     Print Restrictions ? : Yes;
Transaction Type: All Transaction Types;     Print Furloughs / Restitutions ? : Yes;     Include Inmate Totals ? : Yes;     Print
Balance Errors Only ? : No

**Inmate: K97120 Winger, Mark A.**                    **Housing Unit: TAM-C -05-07**

| Date | Source | Transaction Type | Batch | Reference # | Description | Amount | Balance |
|------|--------|-----------------|-------|-------------|-------------|--------|---------|
| | | | | | Beginning Balance: | | 0.00 |
| 06/30/06 | Mail Room | 04 Intake and Transfers In | 181227 | 59843 | Pontiac C.C. | 844.96 | 844.96 |
| 07/05/06 | Mail Room | 01 MO/Checks (Not Held) | 186254 | 1459364426 | Winger, Sallie | 50.00 | 894.96 |
| 07/07/06 | Point of Sale | 60 Commissary | 188713 | 127888 | Commissary | -64.70 | 830.26 |
| 07/11/06 | Payroll | 20 Payroll Adjustment | 192157 | | P/R month of 06/2006 | 4.42 | 834.68 |

| | |
|---|---|
| Total Inmate Funds: | 834.68 |
| Less Funds Held For Orders: | .00 |
| Less Funds Restricted: | 1.95 |
| Funds Available: | 832.73 |
| Total Furloughs: | .00 |
| Total Voluntary Restitutions: | .00 |

**RESTRICTIONS**

| Invoice Date | Invoice Number | Type | Description | Vendor | Amount |
|--------------|----------------|------|-------------|--------|--------|
| 07/05/2006 | | Disb | Legal Postage | 99999 DOC: 523 Fund Inmate Reimbursemen | $1.17 |
| 07/06/2006 | | Disb | Postage | 99999 DOC: 523 Fund Inmate Reimbursemen | $0.39 |
| 07/07/2006 | | Disb | Legal Postage | 99999 DOC: 523 Fund Inmate Reimbursemen | $0.39 |
| | | | | Total Restrictions: | $1.95 |

E-FILED
Thursday, 31 August, 2006 01:46:09 PM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF ILLINOIS

# RECEIVED

MARK A. WINGER
  Plaintiff

)
)
)
)

**AUG 3 1 2006**

JOHM M. WATERS, Clerk
U.S. DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

VS.

)
)

Case No. 06-1226

GUY D. PIERCE

WESLEY G. WILES

ROBERT E. ELLINGER

ERIKA R. HOWARD

ANABELLE MOTTELER

UNDRAY MILLSAP

MELODY FORD

ROGER E. WALKER, JR.

EDWARD JONES
  Defendants

)
)
)
)
)
)
)
)
)
)

## COMPLAINT

Now, comes Plaintiff, Mark A. WINGER, pro se, bringing suit against State officials for violations of his Federal Constitutional Rights under the Eighth and Fourteenth Amendments of the Constitution of the United States pursuant to 42 U.S.C. § 1983, and states as follows:

## JURISDICTION

1. This Court has jurisdiction over Plaintiff's complaint of violations of his Federal Constitutional Rights under 42 U.S.C. §§ 1331(a) and 1343.

## PARTIES

2. The Plaintiff, Mark A. WINGER, is incarcerated at the Tamms Closed Maximum Security prison located at Box # 2000, 200 East Supermax Road, Tamms, IL, 62988.

3. During all times described in this complaint the Plaintiff was incarcerated at the Pontiac Correctional Center at Box # 99, 700 West Lincoln Street, Pontiac, IL, 61764.

4. Defendant Guy D. PIERCE was employed as the Warden of Pontiac Correctional Center until approximately March, 2006 during the time of the events described in this complaint and is now a deputy Director of the I.D.O.C. and maintains his office at the Pontiac Correctional Center, Box # 99, 700 W. Lincoln St., Pontiac, IL 61764, and he is being sued in his individual capacity.

5. Defendant Edward JONES is employed as Warden of the Pontiac Correctional Center at Box #99, 700 W. Lincoln St., Pontiac, IL 61764, and he is being sued in his individual capacity.

6. Defendant Wesley G. WILES is employed as the grievance officer at Pontiac Correctional Center, Box #99, 700 W. Lincoln St., Pontiac, IL, 61764, and is being sued in his individual capacity.

7. Defendant Robert E. ELLINGER is employed as Adjustment Committee chairman at Pontiac Correctional Center, Box #99, 700 W. Lincoln St., Pontiac, IL 61764, and is being sued in his individual capacity.

8. Defendant Erika R. HOWARD is employed as an Adjustment Committee member at Pontiac Correctional Center, Box #99, 700 W. Lincoln St., Pontiac, IL, 61764 and is being sued in her individual capacity.

9. Defendant Anabelle MOTTELER is employed as an Adjustment Committee member at Pontiac

Correctional Center, Box # 99, 700 W. Lincoln St., Pontiac, IL 61764 and is being sued in her individual capacity.

10. Defendant Undray MILLSAP is employed as an Adjustment Committee member of Pontiac Correctional Center, Box # 99, 700 W. Lincoln St., Pontiac, IL, 61764 and he is being sued in his individual capacity.

11. Defendant Melody FORD is employed as the Administrative Review Board Chairperson for I.D.O.C. at 1301 Concordia Ct., Box # 19277, Springfield, IL 62794-9277 and is being sued in her individual capacity.

12. Defendant Roger E. WALKER, Jr., is employed as the Director of I.D.O.C. at 1301 Concordia Court, Box # 19277, Springfield, IL 62794-9277, and is being sued in his individual capacity.

13. All defendants have acted, and continue to act under color of State Law at all times relevant to this complaint.

## LITIGATION HISTORY

14. I have NOT brought any law suits in State or Federal Court dealing with the same facts involved in this complaint.

15. I have NOT brought any other lawsuits in State or Federal court while incarcerated.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

16. There is a grievance procedure at the Pontiac Correctional Center.

17. I HAVE filed a grievance concerning the facts relating to this complaint [see Exhibits C and E].

18. The grievance process is complete.

## STATEMENT OF FACTS

19. On June 17th, 2005 I was placed in the North House Segregation unit at the Pontiac Correctional Center under an investigative status.

20. On July 11th, 2005 I received a disciplinary
ticket alleging various infractions to I.D.O.C.
rules [see Exhibit A.].

21. On July 18th, 2005 I was permitted to respond to
the allegations of said ticket in the presence of
defendants ELLINGER, HOWARD, and MOTTELER.

22. My escort was Correctional Officer WHITE.

23. At the conclusion of the hearing defendant
ELLINGER said that he would file his summary
report that same evening and that I could expect
the final summary report from the "full committee"
within one week.

24. On August 3rd, 2005 I received two separate
summary reports; one marked "continued" and
the other marked "Final" [see Exhibits B-1 and
B-2, respectively].

ADJUSTMENT COMMITTEE ACTIONS SET EVENTS IN MOTION

25. The punishments recommended by the
Adjustment Committee included a one-year
yard restriction which was approved by the

Warden and bears the signatures of defendants
ELLINGER, HOWARD, MOTTELER, MILLSAP, and PIERCE.

26. Defendant PIERCE stipulated that the yard
restriction would be a total yard restriction
for 365 days and that said yard restriction
was due to a non-yard related offense attributed
to violations of the following I.D.O.C. rules:
208; 501; 206; and, 601.100 all attributed to
the same occurance of events [see Exhibits B-3
and H].

27. Federal Rulings and State law forbid such
an objectively unconstitutional punishment and
the Illinois Administrative Code provides prison
officials with substantive predicates within
Department Rules 504 to govern official
decision making in addition to mandating the
outcome upon a finding that the relevant
criteria have been met ; Illinois Administrative
CODE § 504.110, § 504.670(c), § 504. Table A ,
and § 504. Appendix A [see Exhibits H and I-1].

28. Section 504.670 also states throughout
that the maximum restriction of yard exercise
for a first time violation shall not exceed 90 days.

29. Section 504.110 addresses multiple violations and stipulates that the penalty for multiple violations stemming from the same event shall not exceed the maximum penalty for the most serious of the violations [see Exhibits H and I-1].

30. Section 504.670(f) states that the committed person whose yard opportunities have been restricted may grieve the determination in accordance with IL ADMIN CODE 504, subpart F.

DEPRIVATION OF LIBERTY BROUGHT TO LIGHT.

31. On August 11th, 2005 I filed a grievance in response to the Adjustment Committee's findings and their recommendation of a one year yard restriction and to the Warden's assignment of a 365 day total yard restriction [see Exhibit C].

32. My grievance brought to light that the 365 day yard restriction was in violation of Section 504.670 of the IL. ADMIN CODE and that the grievance officer still had opportunity to correct the error before the 90 day threshold

had expired and could therefore have prevented the violation of my liberty interest or injury to occur.

## DELIBERATE INDIFFERENCE

33.    On October 14th, 2005 I received the response to my grievance from the grievance officer, defendant WILES [see Exhibit D]

34.    The grievance officer not only failed to correct the error created by the 365 day yard restriction, but ignored my complaint with deliberate indifference to the imminent violation of my Constitutional Rights.

35.    The grievance officer's response to my grievance was reviewed by Warden PIERCE, and by whose signature shows his approval of the action and inaction of the grievance officer regarding my complaint.

36.    Furthermore, the Warden's concurrance to the response made by defendant WILES demonstrates defendant PIERCE's intent to enforce an unlawful penalty with deliberate indifference.

## THE DIRECTOR'S OFFICE NOTIFIED OF MY COMPLAINT

37.    I appealed the decision of my grievance to the Director's office vis à vis the Administrative Review Board on October 19th, 2005 [See Exhibit E.].

38.    Section 504.850 of the Illinois Administrative code allows the opportunity for inmates to appeal decisions to their grievances which they believe are still unresolved and Section 504.850(b) states:

"The Director shall review the grievance and the response of the grievance officer and chief Administrative officer and shall determine whether the grievance requires a hearing before the Administrative Review Board."

39.    Section 504.850(f) states that:

"The Director shall review the findings of the board and make a final determination of the grievance within six months after receipt of the appealed grievance

where reasonably feasible
under the circumstances. "

40.  On November 23rd, 2005 I was informed
by counselor Osman that the Administrative
Review Board (ARB) had scheduled a video
conference hearing on the appeal of my
grievance to take place on December 14th, 2005.

41.  On December 14th, 2005 I attended the
hearing of my appealed grievance via the
video conference system with the ARB
chairperson, defendant Melody FORD.

42.  At that time I renewed my complaint to
FORD regarding the 365 day yard restriction
and explained to FORD that I was experiencing
psychological injury as a result of the
prolonged deprivation of my Constitutional Right
to exercise away from my cell, which at that
time had already been six months.

43.  Furthermore, I explained to FORD my
belief that the grievance officer acted
with deliberate indifference by ignoring
my complaint and failing to act to remedy

a serious medical need.

44. Defendant FORD asked me what I wanted from her regarding my complaint in my grievance.

45. I told FORD that I wanted compensation in the form of a day for day reduction of my segregation time and other penalties equal in number corresponding to the days in which prison officials had denied my Right to exercise away from my cell beyond the initial 90 days.

46. Giving the appearance that defendant FORD understood the gravity of my psychological stress, FORD agreed to return a ruling on my grievance in one week, even though section 504.850(f) allows the Director six months to respond after initial receipt of my appealed grievance.

## STAFF PSYCHIATRIST AWARE OF PROBLEM

47. On January 6th, 2006 I had occassion to speak with the in-house psychiatrist,

named, Dr. Angus as he was passing by my cell.

48. I explained to Dr. Angus my yard restriction predicament and told him that it was affecting my psychological and physical health.

49. Dr. Angus promised to speak with the house lieutenant about letting me go out to yard, but nothing ever resulted from that.

## DELIBERATE INDIFFERENCE BY FORD AND WALKER

50. On February 24th, 2006 I had occassion to speak with counselor Smith who had passed by my cell.

51. I explained to SMITH about my one year yard restriction and how it was affecting my health and that FORD had not yet returned with her ruling on the matter as she had promised.

52. SMITH agreed to contact the ARB to

learn what the status was of my appeal.

53. On March 20th, 2006 I was again visited by counselor SMITH who told me that the ARB had not returned his call, but that he would send them an e-mail, which was more likely to get a response.

54. On March 31st, 2006 I had another opportunity to speak with Dr. ANGUS as he was passing by my cell.

55. I restated to Dr. ANGUS my yard restriction dilemma and my worsening psychological health as a result of the prolonged yard deprivation, which had now exceeded nine months.

56. Furthermore, I explained to Dr. ANGUS that I had been experiencing what I believed to be panick attacks.

57. Dr. ANGUS suggested that I send him a "Kite" (slang for note) and request to set up an appointment to see him to discuss

my burgeoning health problems.

58.  Dr. Angus said that he would speak to the house Lieutenant again to try to arrange for me to get some yard time, but nothing resulted from that.

59.  That same evening (3-31-06) I sent Dr. ANGUS a "kite" requesting an appointment to speak with him regarding my problem.

60.  On April 12th, 0006 I spoke with Counselor SMITH at my cell and explained to him that I had requested an appointment with DR. ANGUS twelve days earlier, but had not yet been called to see him.

61.  SMITH promised to speak with Dr. ANGUS and get that taken care of right away. SMITH also stated that the ARB had not responded to his e-mail, but that he would try again.

62.  Again, I expressed to SMITH my worsening psychological health and my belief that I had been suffering panick

attacks. We discussed the ill-effects that my yard restriction was having on my health. I agreed to do all I could on my own to stay as healthy as possible and he agreed to contact Dr. ANGUS.

63. After a week, on April 19th, 2006 I decided to send a letter to counselor SMITH reminding him about our conversation of (4-12-06) [See Exhibit F].

64. The letter clearly deliniated the open matters regarding my serious medical need raised in the appeal of my grievance, the ARB's non-responsiveness, and my worsening psychological health.

65. On April 24th, 2006 I was informed by a correctional officer (name unknown) that defendant PIERCE was no longer warden, but had been promoted to Deputy Director of I.D.O.C. and that defendant JONES had become the new warden.

66. Defendant PIERCE's new position placed him in a unique position whereby he may

review and make recommendations to (or even decide on) the recommendation and findings of the ARB regarding my appealed grievance which makes claim against the unlawful punishment that PIERCE imposed himself during phase one of the grievance process and disciplinary process.

67. In the meantime, all of my requests for segregation time cuts, restoration of privileges, and yard time had been either ignored or denied.

68. On at least one occassion Warden PIERCE reviewed the Adjustment Committee's recommendation to deny my request for restoration of privileges, yard, and segregation cut and he denied the request. Likewise, on at least one occassion Warden JONES went along with the Adjustment Committee's recommendation and denied a similar request [see Exhibit 6].

69. On April 27th, 2006 I had occassion to speak with counselor Smith who informed me that he was in receipt of my letter

dated April 19th, 2006 and had allowed the house Major (Major Davidson) to read it.

70.  Smith stated that he believes a yard day exists for those on yard restriction, but had no further information.

71.  I explained to SMITH that such a yard day is not published in the rules, nor has anyone told me about such a yard day in response to my many complaints about not having any yard. Furthermore, I had been told while at North segregation house that I could not go to yard at all.

72.  SMITH claimed that the prison staff was supposed to come by once each month and tell those on yard restriction that there is time available for them to go to yard, but that the staff does not do it.

73.  SMITH said that although he has heard of inmates getting successive 90 day yard restrictions resulting from continued rule violations, he had never heard in his 15

at I.D.O.C. of any inmate getting a 365 day yard restriction from a single ticket, or a first offense, or even multiple violations stemming from the same set of circumstances.

74. SMITH also told me that he spoke to DR. ANGUS who assured SMITH that I was on the doctor's call list.

75. On April 28th, 2006 I received the ARB's response to my appealed grievance. [See Exhibit J-1].

76. The ARB's response arrived slightly beyond their six month time period to respond, however upon examination of the Director's final approval of the ARB's recommendation, e.g., his signature, One can see that his final decision was made almost 4 months earlier, on January 9th, 2006.

77. Not only did the ARB's response drafted by FORD fail to state in the narrative that I also had claimed to

have been suffering psychological injury
due to the prolonged deprivation of yard
exercise away from my cell, but the
willful delay in the response long after
defendant WALKER signed the final
report caused my post-deprivation remedy
to vanish and my suffering to continue
through their deliberate and indifferent
inaction.

78. And, while FORD claims to have
reviewed Department Rule 504 to check
compliance of procedural Due Process, she
apparently overlooked section 504.670 which
clearly restricts the application of yard
restriction to 90 days in the absence of
subsequent violations, which in my case
their are none.

79. The ARB's report confirms that
defendants FORD, WALKER, PIERCE, and
WILES are all in concurrance with the
one year yard restriction that was
recommended by the Adjustment Committee.

80. Furthermore, the ARB's report that

was signed by WALKER on January 9th, 2006 his intent to enforce the 365 day yard restriction even after being made aware of its objective unconstitutionality, as well as my serious medical need.

81.    The ARB report confirms that I had made a claim that defendant WILKS acted with deliberate indifference (see para. 43 of this claim).

82.    On April 30th, 2006 I was unexpectedly approached at my cell by a guard (name unknown) who asked me if I was going to yard [see Exhibit K].

83.    Approximately 10 minutes later my gallery officer, c/o Kling along with c/o Moore escorted me to a yard cage and allowed me to exercise for 1 hour and 15 minutes.

84.    Within two hours after returning to my cell I suffered from what I believed to be a panick attack, fearing that my yard opportunity that day was some sort of

gimmick in response to the Department's staff concern that I was preparing this Federal Complaint.

85.    The 1 hour and 15 minutes of yard time offered on April 30th, 2006 was my 1st and only opportunity to exercise away from my cell in 319 consecutive days of being confined to my cell.

86.    I was informed that my next opportunity for yard time would be on May 27th, 2006 for one hour.

87.    On April 30th, 2006 I wrote a letter to counselor SMITH to thank him for his efforts in arranging that I get some yard time [see Exhibit L].

88.    Also, in the letter I reminded SMITH that I still have not yet been called to see the in-house psychiatrist, DR. ANGUS to discuss my panick attacks. I asked SMITH to assist me in getting an appointment with DR. ANGUS.

89.    On Thursday, May 11th, 2006 I was called to see DR. ANGUS, 41 days after my initial written request. [See Exhibit M].

90.    DR. ANGUS confirmed to me that the only reason I was given yard time on April 30th, 2006 was due to Counselor SMITH "pulling some strings with Major Davidson." [See Exhibit M]

91.    On May 16th, 2006 I was displaced from my cell in East House Segregation and moved to a smaller cell back into the less favorable North House segregation.

92.    I had been falsely accused of getting one of my family members or friends to send a gift to Counselor SMITH in order to gain his favor.

93.    The accusation was shown to be completely false and shown that I had nothing to do with the gift sending [see Exhibit N].

94.    In spite of the fact that I was

cleared of any wrongdoing, I was still
displaced to a smaller cell in the less
favorable North House, with total indifference
to my burgeoning panick attacks.

95.   On May 24th, 2006 I had my second
consultation with DR. ANGUS. [see
Exhibit O].

96.   On May 27th, 2006 I had my cell in
cell compliance and was prepared to go
to my yard time for those on yard
restriction.

97.   However, when my gallery officer, C/o
SMALL came by for morning count he
told me that I was not on the approved
yard sheet [see Exhibit P].

98.   Thus, I was denied the "promised"
yard time that I was allegedly supposed to
receive. [see Exhibit Q].

99.   The resulting denial of yard on May
27th, 2006 supports my earlier assumptions
that the April 30th, 2006 yard time was

simply a ruse to get me to stop complaining and to convince me not to file this Federal complaint.

100.   On about Wednesday, June 5th, 2006 I was moved back to East House Segregation.

101.   After the move back to East House I had occassion to speak with Warden JONES, Lt. De Long, and later Counselor SMITH. All indications given to me were that I would be returning to South House, protective custody at Pontiac after my release from segregation in the coming week.

102.   However, on the day of my anticipated release from segregation and after completing 364 days of my one year penalty without incident, I was unexpectedly woken up and told to get dressed and that I was being transferred immediately.

103.   Without prior notice or any reason

given, I was shipped to Tamms Supermax prison in Tamms, IL. I have reasons to believe that my transfer to Tamms was in retaliation by the prison staff due to their knowledge that I was preparing this complaint.

104. Furthermore, upon my arrival to Tamms I was placed in Behavioral Level 1A with a yard restriction until July 13th, 2006. I was informed that my yard restriction was a complete yard denial which followed me from Pontiac and was not initiated by Tamms. [See Exhibits R-1 and R-2]

# STATEMENT OF CLAIM

105. The occurrance of this claim took place at the Pontiac Correctional Center in Pontiac, IL, from June 17th, 2005 through June 16th, 2006.

106. Witnesses to the occurrance of this claim include: Counselor SMITH; Dr. ANGUS; C/o VILTS; C/o SMALL; and, the Majors and Lieutenants of North House and East House segregation units.

107. <u>I WAS DEPRIVED OF MY RIGHT UNDER THE EIGHTH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES WHICH PROHIBITS CRUEL AND UNUSUAL PUNISHMENT</u>, WHEN :

108. <u>COUNT - 1</u>:    Defendants HOWARD, ELLINGER, MOTTELER, and MILLSAP recommended to the Warden that my punishment include a 365 day restriction from yard exercise, which is objectively unconstitutional and which they knew exceeded the 90 day limit established by the Illinois Administrative Code, § 504.650. (paragraphs 19-30 of this complaint).

109. <u>COUNT - 2</u>:    Defendant PIERCE knowingly assigned a 365 day total yard restriction as a punishment, which was prohibited by law and was in violation of the Illinois Administrative Code § 504.650. (paragraphs 19-30).

110. <u>COUNT - 3</u>:    Defendant WILES acted with deliberate indifference by failing to remedy the unlawful 365 day total yard restriction even after it was specifically brought to

his attention that the severity of the punishment violated the Illinois Administrative Code, § 504.670 and at that time he still had opportunity to correct the error before the 90 day maximum had expired. (paragraphs 3*-34).

111. <u>COUNT-4:</u> After reviewing my grievance and complaint of the 365 Day yard restriction, Defendant PIERCE acted with deliberate indifference by approving the grievance officer's response to my grievance which itself ignored my complaint, thus demonstrating defendant PIERCE's intent to knowingly enforce a prohibited punishment. (paragraphs 33-35).

112. <u>COUNT-5:</u> Defendant PIERCE acted with deliberate indifference by denying my request for reduction in penalty and ignored my serious medical need during his 90 day review. (paragraph 68).

113. <u>COUNT-6:</u> Defendant JONES acted with deliberate indifference during his 90 day review of my yard restriction by ignoring

my serious medical need and keeping in force a prohibited punishment.

114. <u>COUNT-7</u>:   Defendant FORD acted with deliberate indifference by failing to respond in a timely manner to my complaint of a serious medical need stemming from the unlawful 365 day total yard restriction raised in my appeal of my grievance. (paragraphs 37-95).

115. <u>COUNT-8</u>:   Defendant FORD acted with deliberate indifference by ignoring my complaint that the 365 day yard restriction violated my Federal Constitutional Rights, yet she claimed in her summary report to the director of I.D.O.C. that she had performed a compliance check of procedural Due Process rules against my grievance utilizing the safeguards outlined in Department Rule 504, which actually show that the 365 day yard restriction was prohibited. (paragraphs 76-78).

116. <u>COUNT-9</u>:   Defendant WALKER acted with deliberate indifference by failing to remedy

the unlawful 365 day yard restriction
raised as a complaint in my grievance.
(paragraphs 76-81).

117. <u>COUNT-10</u>: Defendant WALKER acted
with deliberate indifference by failing to
respond to my serious medical need stemming
from the complaint of the 365 day yard
restriction or to act to remedy my
serious medical need. WALKER's deliberate
indifference to my serious medical need
was compounded when he delayed to
inform me four (4) months after he had
approved and signed the ARB's summary
report. (paragraphs 76-81).

118. <u>COUNT-11</u>: Defendants PIERCE, WILES,
JONES, FORD, and WALKER acted with
deliberate indifference and demonstrated
their intent to enforce the 365 day
yard restriction brought to light in my
grievance even though the punishment
was objectively unconstitutional and in
violation of Illinois Admin Code Rule 504.
(see statement of co-concurrance in the ARB
summary report, Exhibit J-1).

119.    MY RIGHTS UNDER THE FOURTEENTH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES TO DUE PROCESS OF LAW WERE VIOLATED WHEN I SUFFERED A DEPRIVATION OF LIBERTY WHEN:

120.  COUNT-12: My eighth amendment Right to the Constitution of the United States prohibiting cruel and unusual punishment was violated in each, or any of the complaints found in counts one through eleven of this complaint.

121.  COUNT-13: Defendants HOWARD, ELLINGER, MOTTELER, and MILLSAP conspired to assign a prohibited punishment which violated the punishment guidelines set forth in the Illinois Administrative Code § 504.620. (paragraphs 19-30).

122.  COUNT-14: Defendant PIERCE assigned an objectively unconstitutional punishment of 365 Days total yard restriction against me. (paragraphs 18-30).

123. COUNT-15: Defendants PIERCE and WILES conspired to enforce a prohibited punishment of 365 days total yard restriction against me. (paragraphs 31-36).

124. COUNT-16: Defendant FORD claimed and reported to the Director of I.D.O.C. that the 365 day total yard restriction was in compliance with Department Rule 504 and recommended the he approve her false claim by denying the appeal of my grievance. (paragraphs 76-78).

125. COUNT-17: Defendant WALKER reviewed my appealed grievance and the ARB's recommendation to let stand a prohibited punishment. (paragraphs 76-81).

126. COUNT-18: Defendant FORD conspired with others to delay informing me of the Director's decision to let remain in force the 365 day yard restriction, with deliberate indifference to my serious medical need. (paragraphs 41-46, Exhibit J-1)

127.   <u>COUNT-19</u>:   Defendants PIERCE, WILES, WALKER, and FORD conspired to allow a prohibited punishment to remain in force even after being shown in clear and unambiguous language as stated in Department Rules that the 365 day yard restriction exceeded the permissible limits and they did so with deliberate indifference even after being made aware that the excessive punishment had created a serious medical need. (paragraph 79, and Exhibit J-1).

128.   <u>COUNT-20</u>:   Defendants PIERCE and JONES acted with deliberate indifference during their 90-day reviews of my yard restriction by ignoring the medical need raised to the ARB and to the in-house psychiatric doctor and to my counselor concerning the impact of the 365 day yard restriction. (paragraphs 42, 47-49, 50-64, 67-74, 82-98)

129.   <u>COUNT-21</u>:   Defendants PIERCE and JONES conspired to transfer me to Tamms Super-max prison in retaliation to my efforts to prepare this complaint.

# RELIEF REQUESTED

WHEREFORE, Plaintiff requests that the Court grant the following relief:

A. ISSUE A DECLARATORY JUDGEMENT THAT:

1. The assignment of a 365 day yard restriction for a first offense of non-yard related violations of Department Rules violated Plaintiff's FOURTEENTH Amendment Right to Due Process where prison officials exceeded their discretion of a state created liberty interest which placed substantive limits on official discretion.

2. Allowing Plaintiff only one hour and fifteen minutes of yard exercise in one year violated Plaintiff's EIGHTH Amendment Right against cruel and unusual punishment.

3. Defendants PIERCE and WILES acted with deliberate indifference by failing to remedy the prohibited punishment and refusing to even address the matter when the plaintiff raised the issue in his grievance.

4. Even if Plaintiff had been offerred one hour of yard time per month as is provided to other inmates on limited yard restriction at Pontiac Correctional Center, such a restriction over a prolonged period of time is a violation against cruel and unusual punishment under the Eighth Amendment to the Constitution of the United States.

5. The relevant language used in the I.D.O.C. Rule 504.670 is sufficiently mandatory and establishes substantive predicates governing official decision making to create a protected liberty interest.

6. Defendant FORD acted with deliberate indifference by ignoring plaintiff's serious medical need.

7. Defendant WALKER acted with deliberate indifference by ignoring Plaintiff's serious medical need.

8. Defendants PIERCE and JONES

acted with deliberate indifference in each of their 90 day reviews of Plaintiff's 365 day yard restriction by ignoring Plaintiff's serious medical need.

9. Delaying the report denying Plaintiff's appeal four four months after the Director approved the ARB's final summary prevented Plaintiff from pursuing any adequate post-deprivation remedy and ignored Plaintiff's serious medical need with deliberate indifference.

10. Defendants HOWARD, ELLINGER, MOTTELER, and MILLSAP conspired to recommend a prohibited punishment against the Plaintiff.

11. Defendants PIERCE, WILES, FORD, and WALKER conspired to allow a prohibited punishment to remain in force although each defendant had been alerted by the plaintiff that the punishment exceeded Department Rules, and furthermore defendants FORD and WALKER were aware

of Plaintiff's serious medical need stemming from the prolonged deprivation of any exercise away from his cell.

B. AWARD OF COMPENSATORY DAMAGES IN THE FOLLOWING AMOUNTS:

1. $100,000 dollars jointly and severally against defendants PIERCE and WILES for the psychological and physical injuries sustained by Plaintiff resulting from their deliberate indifference in failing to act on Plaintiff's grievance and remedy the prohibited 365-day yard restriction.

2. $100,000 dollars jointly and severally against defendants PIERCE and JONES for the psychological and physical injuries sustained by Plaintiff resulting from defendants' deliberate indifference to Plaintiff's medical need during each of their 90 day reviews of Plaintiff's 365 day yard restriction.

3.    #100,000 dollars jointly and severally against Defendants FORD and WALKER for the psychological and physical injury to Plaintiff resulting from their deliberate indifference to respond to the stated serious medical needs of the Plaintiff and for failing to remedy the prohibited 365 Day yard restriction.

4.    #125,000 dollars jointly and severally against defendants PIERCE, HOWARD, ELLINGER, MOTTELER, and MILLSAP for the psychological injuries suffered by the Plaintiff proximately caused by the defendants and resulting from their joint efforts to affix a prohibited punishment against plaintiff.

C.    AWARD PUNITIVE DAMAGES IN THE FOLLOWING AMOUNTS:

1.    #75,000 dollars each against defendants PIERCE, JONES, WILES, FORD, and WALKER.

2.   #15,000 dollars each against defendants HOWARD, ELLINGER, MOTTELER, and MILLSAP.

D.   Grant all other relief as it may appear plaintiff is entitled.

E.   Plaintiff demands a jury trial.

Signed _____ 10th _____ day of _August_ 2006

_____
Signature Plaintiff

Plaintiff Name:   MARK A. WINGER
Inmate Registration Number:   K97120
Address:   P.O. Box #2000, 200 East Supermax Road, Tamms, IL 62988

**E-FILED**
Thursday, 31 August, 2006  01:46:16 PM
Clerk, U.S. District Court, ILCD

ALL-STATE LEGAL®
**DEFENDANT'S**
**EXHIBIT**
A

☒ Disciplinary Report  07/11/2005 _____   ☐ Investigative Report _____
Date                                                                            Date

Committed Person: Winger, Mark A. _____   No. K97120 _____   Facility: Pontiac _____

Observation Date: 07/11/2005 _____   Time: 8:0 _____ ☒ am , ☐ pm   Location: Intel _____

C/O Edward Vit #3439 _____   ⁴⁄₆ 7V H 3439 _____   07/11/05  8:0   ☒ am ☐ pm
PRINT Employee's Name              Employee's Signature              Date    Time

☐☒ A 601-100: Solicitation of Violent Assault of Any Person

Offense: 504 ☐ B 206: Intimidation or Threats, 208: Dangerous Communication
          ☐ C 501: Violating State or Federal Laws

Observation: This Disciplinary Report is the result of a joint investigation conducted by the Intel unit of the Pontiac Correctional Center, other IDOC Agents, and Outside Law Enforcement agencies. Through the collection of Physical Evidence and information provided by registered Confidential Informant # CIU-05-067-PON, the conclusion of this investigation is that Offender Mark A. Winger K97120 violated Departmental Rules relevant to 601-100, Solicitation of Violent Assault of any person, 206 - Intimidation or Threats, 208 - Dangerous Communication, and 501 - Violation of State or Federal Laws, namely 720 ILCS 5/8-1.1 Solicitation of Murder, 720 ILCS 5/10-2 Aggravated Kidnapping for Ransom.

Witnesses, if any:

NOTE: Use continuation page if necessary to describe observation and/or list witnesses.

☐ Temporary Confinement        ☐ Investigative Status
Reasons: _____

_____   _____
PRINT Name                          Shift Supervisor's Signature         Date
                                    (For Community Correctional Centers, Chief Adm. Off.)

☐ Confinement Reviewed by Reviewing Officer   Comments: _____

_____   _____
PRINT Name                          Signature                            Date

☐ MAJOR, submitted to Adjustment Committee    ☐ MINOR, submitted to Program Unit

_____   _____
PRINT Name                          Reviewing Officer's Signature        Date

☐ Reviewed by Hearing Investigator: _____
(Adult Division Major Reports Only)   PRINT Name        Signature        Date

PROCEDURES APPLICABLE TO ALL HEARINGS ON INVESTIGATIVE AND DISCIPLINARY REPORTS

You have the right to appear and present a written or oral statement or explanation concerning the charges. You may present relevant physical material such as records or documents.

PROCEDURES APPLICABLE TO HEARINGS CONDUCTED BY THE ADJUSTMENT COMMITTEE ON DISCIPLINARY REPORTS

You may ask that witnesses be interviewed and, if necessary, they may be called to testify during your hearing. You may ask that witnesses be questioned along lines you suggest. You must indicate in advance of the hearing the witnesses you wish to have interviewed and specify what they could testify to by filling out the appropriate space on this form, tearing it off, and returning it to the Adjustment Committee. You may have staff assistance if you are unable to prepare a defense. You may request a reasonable extension of time to prepare for your hearing. If you are found guilty of a serious rule violation, you may be placed in confinement and/or lose privileges, and/or be required to make restitution. In addition, juveniles may receive a delay in recommended parole.

Committed Person Refused to Sign ☐

_____   _____
Committed Person's Signature        Number

                                                                      ☐ am ☐ pm
_____   _____
PRINT Serving Employee's Name       Serving Employee's Signature    Date    Time Served

I hereby agree to waive 24-hour notice of charges prior to the disciplinary hearing.

Offense Date: _____
                                    _____   Number
                                    Committed Person's Signature

(DETACH AND RETURN TO THE ADJUSTMENT COMMITTEE OR PROGRAM UNIT PRIOR TO THE HEARING)

I would like the Adjustment Committee or Program Unit to consider calling the following witnesses regarding disciplinary report of _____.
                                                                              Date

NAME OF WITNESS: _____   Number/Cell/Title: _____

Witness can testify to: _____

NAME OF WITNESS: _____   Number/Cell/Title: _____

Witness can testify to: _____

_____   _____
Committed Person's Name              Number

DC 7285 (Rev. 5/00)  Distribution:  1) Master File; 2) Committed Person
IL 426—361                          3) Facility;  4) Facility

State of Illinois—Department of Corrections
**DISCIPLINARY REPORT**

☒ Disciplinary Report    ☐ Investigative Report

Committed Person: Winger, Mark A.    No. K97120    Facility: Pontiac

Observation Date: 07/11/2005    Time: 08:00    ☒ am ☐ pm    Location: Intel

During the course of this investigation evidence was collected to substantiate the fact that Winger solicited an individual, whose identity will remain confidential, to arrange for the kidnapping and murder of a witness from Winger's original criminal trial. It is also verified through evidence collection that Winger instructed the individual, both in verbal and written communication, on how to proceed with the kidnapping and murder of the witness, as well as information on kidnapping a third party for the purpose of collecting a ransom to fund the kidnapping / murder of the witness. Physical evidence collected corroborates information provided by CI # 05-067-PON that Winger solicited an individual to kidnap the key witness in Winger's original criminal trial for the purpose of forcing the witness to recant information and testimony provided to authorities. Winger's specific instructions included staging the scene of the kidnapping to make it look as though the witness left on their own power, forcing the witness to produce a written as well as an audio recantation of testimony provided, sending the recantation to a family member of Winger's, as well as Winger Attorney, then killing the witness in a manor which would lead authorities to believe that it was a suicide. Evidence collected also substantiates the fact that Winger's purpose for this to take place was to eliminate the witness in anticipation of receiving a new trial, therefore improving Winger's chances of not being found guilty in the second trial. All physical evidence collected during the course of this investigation is in the possession of the Outside Law Enforcement Agencies. It should be noted that the written communication mentioned in the body of this report has been compared to origional hand written documents from Offender Winger and bares many similar characteristics. Specifics of the evidence collected during the course of this investigation are not directly referenced in this Disciplinary Report for the purpose of maintaining the integrity of this investigation, the safety of the Confidential informant, the security of the Institution, as well as any possible prosecution that may be imposed after a total review of all available facts and evidence by the Jurisdictional Prosecuting Authority. Offender Winger has been positively identified by Inmate Identification Card, OTS, Institutional Graphics, and CI# 05-067-PON.

**E-FILED**
Thursday, 31 August, 2006  01:46:25 PM
Clerk, U.S. District Court, ILCD



EXHIBIT
B-1

# STATE OF ILLINOIS - DEPARTMENT OF CORRECTIONS
## ADJUSTMENT COMMITTEE
## FINAL SUMMARY REPORT

| | | | |
|---|---|---|---|
| **Name:** WINGER, MARK A | | **IDOC Number:** K97120 | **Race:** WHI |
| **Hearing Date/Time:** 7/18/05  09:51 AM | | **Living Unit:** PON-N-07-34 | **Orientation Status:** N/A |
| **Incident Number:** 200503375/1 - PON | | **Status:** Continued Final | |

| Date | Ticket # | Incident Officer | Location | Time |
|---|---|---|---|---|
| 7/11/05 | 200503375/1-PON | VILT, EDWARD J | INTERNAL AFFAIRS | 08:00 AM |

| Offense | Violation | Final Result |
|---|---|---|
| 208 | Dangerous Communications | |
| 501 | Violating State Or Federal Laws  
Comments: 720 ILCS 5/8-1.1 | |
| 601.Solicitation/100 | Violent Assault Of Any Person  
Comments: SOLICITED MURDER OF A WITNESS | |
| 206 | Intimidation Or Threats | |

| Witness Type | Witness ID | Witness Name | Witness Status |
|---|---|---|---|
| No Witness Requested | | | |

## RECORD OF PROCEEDINGS
REPORT READ. OFFENDER WINGER STATED HE IS NOT GUILTY. OFFENDER FURTHER COMMENTED, "I SEE NO EVIDENCE, NO EVIDENCE HAS BEEN PRESENTED. I KNOW YOU HAVE A SNITCH, TELLING STORIES. NONE OF THE CHARGES APPLY TO ME. WHERE IS THE EVIDENCE? THE OUTSIDE INVESTIGATORS TOLD ME THAT THEY WANTED ME TO HELP THEM WITH AN INVESTIGATION TO HELP ME GET THE MAN. THEY WANTED ME TO SIGN A PAPER TO WAIVE MY RIGHT TO AN ATTORNEY....."

**OFFENDER THEN BEGAN TO CITE STATUTES, STATING THE REQUIREMENTS FOR LAW ENFORCEMENT TO SHOW CAUSE/SUBSTANTIATION OF SAID CHARGES.

## BASIS FOR DECISION
THE COMMITTEE IS CONTINUING THE DR BASED UPON THE GARNERING OF EVIDENCE AS REQUESTED BY THE OFFENDER AT THE TIME OF THE HEARING.

## DISCIPLINARY ACTION  *(Consecutive to any priors)*

| RECOMMENDED | FINAL |
|---|---|
| **CONTINUE** | **—CONTINUED—** |
| **Discipline**   **TICKET CONTINUED**  
**Reason:** | |

## Signatures
### Hearing Committee

| | | | |
|---|---|---|---|
| ELLINGER, ROBERT E  - Chair Person | *Signature* | 07/18/05 | WHI |
| | | **Date** | **Race** |
| HOWARD, ERIKA R | *Signature* | 07/18/05 | WHI |
| | | **Date** | **Race** |
| MOTTELER, ANABELLE | *Signature* | 07/18/05 | HSP |
| | **Signature** | **Date** | **Race** |

Recommended Action Approved

**Final Comments:** N/A

STATE OF ILLINOIS - DEPARTMENT OF CORRECTIONS

## ADJUSTMENT COMMITTEE
## FINAL SUMMARY REPORT

**Name:** WINGER, MARK A

**Hearing Date/Time:** 7/18/05   09:51 AM

**Incident Number:** 200503375/1 - PON

**IDOC Number:** K97120

**Living Unit:** PON-N-07-34

**Status:** Continued Final

**Race:** WHI

**Orientation Status:** N/A

GUY D PIERCE / MPM 7/20/05

**Chief Administrative Officer**

07/20/05

**Signature**                              **Date**

The committed person has the right to appeal an adverse decision through the grievance procedure established by Department Rule 504: Subpart F.

**Employee Serving Copy to Committed Person**

8-2-05  3:10pm  by mail

**When Served - - Date and Time**

E-FILED
Thursday, 31 August, 2006  01:46:32 PM
Clerk, U.S. District Court, ILCD



# STATE OF ILLINOIS DEPARTMENT OF CORRECTIONS
## ADJUSTMENT COMMITTEE
### FINAL SUMMARY REPORT

| | | | | |
|---|---|---|---|---|
| **Name:** WINGER, MARK A | | **IDOC Number:** K97120 | | **Race:** WHI |
| **Hearing Date/Time:** 7/21/05  02:00 PM | | **Living Unit:** PON-N-07-34 | | **Orientation Status:** N/A |
| **Incident Number:** 200503375/2 - PON | | **Status:** Final | | |

| Date | Ticket # | Incident Officer | Location | Time |
|---|---|---|---|---|
| 7/11/05 | 200503375/1-PON | VILT, EDWARD J | INTERNAL AFFAIRS | 08:00 AM |

| Offense | Violation | Final Result |
|---|---|---|
| 601.Solicitation/100 | Violent Assault Of Any Person<br>Comments:SOLICITED MURDER OF A WITNESS | Guilty |
| 208 | Dangerous Communications | Guilty |
| 206 | Intimidation Or Threats | Guilty |
| 501 | Violating State Or Federal Laws<br>Comments:720 ILCS 5/8-1.1 | Guilty |

| Witness Type | Witness ID | Witness Name | Witness Status |
|---|---|---|---|
| **No Witness Requested** | | | |

## RECORD OF PROCEEDINGS

REPORT READ. OFFENDER WINGER STATED HE IS NOT GUILTY. OFFENDER FURTHER COMMENTED, "I SEE NO EVIDENCE, NO EVIDENCE HAS BEEN PRESENTED. I KNOW YOU HAVE A SNITCH, TELLING STORIES. NONE OF THE CHARGES APPLY TO ME. WHERE IS THE EVIDENCE? THE OUTSIDE INVESTIGATORS TOLD ME THAT THEY WANTED ME TO HELP THEM WITH AN INVESTIGATION TO HELP THEM GET THE MAN. THEY WANTED ME TO SIGN A PAPER WAIVING MY RIGHT TO AN ATTORNEY....."

**OFFENDER WINGER THEN BEGAN TO CITE STATUTES, STATING THE REQUIREMENTS DEEMING LAW ENFORCEMENT TO SHOW CAUSE/SUBSTANTIATION OF SAID CHARGES.

**NOTE: HANDWRITING ANALYSIS WAS ACQUIRED FROM OFFENDER WINGER'S MASTER FILE FOR COMPARISON TO THE PHYSICAL EVIDENCE REVIEWED BY THE COMMITTEE.

**THE CONFIDENTIAL SOURCE WAS DEEMED RELIABLE DUE TO VERBAL INFORMATION PROVIDED BY THE SOURCE CORROBORATING WITH PHYSICAL EVIDENCE RECEIVED AT A LATER DATE.

**THE SOURCE'S IDENTITY REMAINS CONFIDENTIAL AND WILL NOT BE REVEALED FOR THE SAFETY AND SECURITY OF THE CONFIDENTIAL INFORMANT'S PERSON, AS WELL AS, THE SECURITY OF THE INSTITUTION.

**C/O E. VILT WAS CONTACTED BY THE COMMITTEE AND CONFIRMED THAT ALL INFORMATION RECORDED ON DR WAS TRUE AND ACCURATE TO THE BEST OF HIS KNOWLEDGE.

## BASIS FOR DECISION

BASED ON THE RESULT OF A JOINT INVESTIGATION CONDUCTED BY THE INTEL UNIT OF THE PONTIAC CORRECTIONAL CENTER, AND OTHER IDOC AGENTS, AS WELL AS, OUTSIDE LAW ENFORCEMENT AGENCIES. THROUGH THE COLLECTION OF PHYSICAL EVIDENCE (REVIEWED BY THE COMMITTEE), ALONG WITH INFORMATION PROVIDED BY THE CONFIDENTIAL INFORMANT (THAT WAS DEEMED RELIABLE THROUGH CORROBORATING INFORMATION) - THE CONCLUSION OF THE INVESTIGATION DEEMED THAT OFFENDER WINGER VIOLATED DEPARTMENTAL RULES 208, 501, 206 AND 601.100. THE COMMITTEE REVIEWED EVIDENCE THAT VERIFIED THAT WINGER INSTRUCTED AN INDIVIDUAL ON HOW TO PROCEED WITH THE KIDNAPPING AND MURDER OF A WITNESS, AS WELL AS INFORMATION ON KIDNAPPING A THIRD PARTY FOR THE PURPOSE OF COLLECTING A RANSOM TO FUND THE KIDNAPPING/MURDER OF THE AFOREMENTIONED WITNESS. THE PHYSICAL EVIDENCE COLLECTED CORROBORATES WITH THE INFORMATION PROVIDED BY THE CONFIDENTIAL SOURCE THAT WINGER SOLICITED AN INDIVIDUAL TO KIDNAP THE KEY WITNESS IN WINGER'S ORIGINAL CRIMINAL TRIAL FOR THE PURPOSE OF FORCING THE WITNESS TO RECANT INFORMATION AND TESTIMONY PROVIDED TO AUTHORITIES. IT SHOULD BE NOTED THAT THE WRITTEN COMMUNICATION MENTIONED IN THE BODY OF THIS REPORT HAS BEEN COMPARED TO ORIGINAL HANDWRITTEN DOCUMENTS ACQUIRED FROM WINGER'S MASTER FILE AND BEARS MANY SIMILAR CHARACTERISTICS (ATTACHED). OFFENDER WINGER WAS POSITIVELY ID BY ID CARD, OTS, INSTITUTIONAL GRAPHICS AND THE CONFIDENTIAL INFORMANT. **THE CONFIDENTIAL SOURCE'S IDENTITY WILL BE KEPT CONFIDENTIAL FOR THE SAFETY AND SECURITY OF THE INSTITUTION, AS WELL AS, THE SAFETY OF THE SOURCE'S PERSON; THE COMMITTEE IS SATISFIED ALL VIOLATIONS OCCURRED AS REPORTED.

# STATE OF ILLINOIS - DEPARTMENT OF CORRECTIONS
## ADJUSTMENT COMMITTEE
## FINAL SUMMARY REPORT

**Name:** WINGER, MARK A   **IDOC Number:** K97120   **Race:** WHI

**Hearing Date/Time:** 7/21/05  02:00 PM   **Living Unit:** PON-N-07-34   **Orientation Status:** N/A

**Incident Number:** 200503375/2 - PON   **Status:** Final

### DISCIPLINARY ACTION  *(Consecutive to any priors)*

| RECOMMENDED | FINAL |
|---|---|
| 1 Year CGrade | 1 Year CGrade |
| 1 Year Segregation | 1 Year Segregation |
| Revoke GCC or SGT 1 Year | Revoke GCC or SGT 1 Year |
| 1 Year Audio/Visual Restriction | 1 Year Audio/Visual Restriction |
| 1 Year Yard Restriction Restriction | 1 Year Yard Restriction Restriction |
| 1 Year Commissary Restriction | 1 Year Commissary Restriction |
| 1 Year Contact Visits Restriction | 1 Year Contact Visits Restriction |

**Discipline Reason:**   **SERIOUSNESS/NATURE OF OFFENSE**

## Signatures
### Hearing Committee

| | | Date | Race |
|---|---|---|---|
| ELLINGER, ROBERT E  - Chair Person | *Signature* | 07/21/05 | WHI |
| HOWARD, ERIKA R | *Signature* | 07/21/05 | WHI |
| MILLSAP, UNDRAY | *Signature* | 07/21/05 | BLK |

Recommended Action Approved

---

**Final Comments:** N/A

---

GUY D PIERCE / MPM  7/22/05     *[signature]*   07/22/05

**Chief Administrative Officer**    **Signature**    **Date**

The committed person has the right to appeal an adverse decision through the grievance procedure established by Department Rule 504: Subpart F.

*[signature]*     8-2-05  3:00pm by mail

**Employee Serving Copy to Committed Person**    **When Served  -- Date and Time**

E-FILED
Thursday, 31 August, 2006  01:46:39 PM
Clerk, U.S. District Court, ILCD

DEFENDANT'S
EXHIBIT
ALL-STATE LEGAL®
B-3

State of Illinois
Department of Corrections

RECREATION RESTRICTION

_Winger, Mark_       _K91120_       _Pontiac CC_
(Inmate Name)         (Inmate Number)       (Facility)

The above inmate's recreation opportunities are restricted as follows:

☑ Recreation Restriction for _365_ days.  If not total restriction, specify

amount of recreation to be received: _____ and/or

☐ Limited Recreation for _____ days.  Specify amount of recreation inmate shall

receive: _____

The restriction is imposed due to:

☑ Disciplinary violation(s) of _7-11-05_ _____ for

(Dates)

_208, 501, 206, 601, 100_ which are/are not yard related.
(Infractions)                    (Circle one)

☐ Investigation of inmate.

☐ Medical or mental health of inmate.  Reasons: _____

_____

Signature of Health Care Professional: _____

☐ Inmate's protection, including informants and witnesses in criminal cases.

☐ High escape risk.

_C. D. Pierce mc_              _8/1/05_
(Warden or Designee)                (Date)

Distribution:  1) Chief of Security; 2) Inmate Master File; 3) Inmate.

DCA 7070 (Eff. 3/89)
IL 426-13303

**E-FILED**
Thursday, 31 August, 2006  01:46:47 PM
Clerk, U.S. District Court, ILCD



041097

| Date: 8-16-05 | Committed Person: (Please Print) MARK WINGER | ID#: K97120 |
|---|---|---|

Present Facility: Pontiac Correction Ctr.  Facility where grievance issue occurred: Pontiac Correction Ctr.

**NATURE OF GRIEVANCE:**

- [ ] Personal Property
- [ ] Staff Conduct
- [ ] Transfer Denial by Facility
- [ ] Mail Handling
- [ ] Dietary
- [ ] Transfer Denial by Transfer Coordinator
- [ ] Restoration of Good Time
- [ ] Medical Treatment
- [ ] Disability
- [ ] Other (specify): _____

- [X] Disciplinary Report: 7 / 11 / 05    Pontiac Correctional Center
  Date of Report                           Facility where issued

**Note:** Protective Custody Denials may be grieved immediately via the local administration on the protective custody status notification.

Complete: Attach a copy of any pertinent document (such as a Disciplinary Report, Shakedown Record, etc.) and send to:

Counselor, unless the issue involves discipline, is deemed an emergency, or is subject to direct review by the Administrative Review Board.
Grievance Officer, only if the issue involves discipline at the present facility or issue not resolved by Counselor.
Chief Administrative Officer, only if EMERGENCY grievance.
Administrative Review Board, only if the issue involves transfer denial by the Transfer Coordinator, protective custody, involuntary administration of psychotropic drugs, issues from another facility except personal property issues, or issues not resolved by the Chief Administrative Officer.

Brief Summary of Grievance:

Summary and Exhibits are attached to this grievance form.

Relief Requested: See Attached Sheets

- [ ] Check only if this is an EMERGENCY grievance due to a substantial risk of imminent personal injury or other serious or irreparable harm to self.

_(signature)_   K97120   8 / 16 / 05
Committed Person's Signature        ID#        Date

(Continue on reverse side if necessary)

---

**Counselor's Response (if applicable)**

Date Received: ___/___/___

- [ ] Send directly to Grievance Officer
- [ ] Outside jurisdiction of this facility. Send to Administrative Review Board, P.O. Box 19277, Springfield, IL 62794-9277

Response: _____

Print Counselor's Name        Counselor's Signature        Date of Response

---

**EMERGENCY REVIEW**

Date Received: ___/___/___

Is this determined to be of an emergency nature?
- [ ] Yes; expedite emergency grievance
- [ ] No; an emergency is not substantiated. Committed person should submit this grievance in the normal manner.

Chief Administrative Officer's Signature        ___/___/___ Date

# GREIVANCE

This greivance relates to Disciplinary Report number 200503375/1-PON, pursuant to greivance procedures established in 20 Illinois Administrative Code, Chapter I, Section 504, subchapter F. Specifically, Section 504.810, (a) and (b).

The aforementioned Disciplinary Report and Final Summary of charges and punishment are procedurally defective as well as substantively defective, for the following reasons:

(1)    20 IL ADMIN CODE, 504. TABLE-A states that for offense 501, "Violating State and Federal Laws", that if the specific offense is stated elsewhere in this part, a committed person may not be charged with this offense.

However, ticket #200503375/1-PON does in fact charge committed person with 501 and ~~601.~~ 601. Solicitation/100, which is in violation of the CODE.

(2)    20 IL ADMIN CODE, 504.60 (e) states that, "--- However, if the investigation reveals evidence of a convincing nature that the committed person did not commit the offense, that evidence must be reported to the committee.

At no time was the committee shown evidence to substantiate the accusation that the committed

person ever Commanded, Requested, or
Encouraged any other person to commit the
act of 1st degree murder of a witness
or any other person.

   Not only does the committed person deny the
false accusation, but in fact no such evidence
exists.

   Therefore, the charge of 60d. Solicitation /100
is unsubstantiated and should therefore be
expunged along with the charge (already in
violation of the code) 501.


(3)  20 IL ADMIN CODE, 504.80 (h)(2) states that,
"A committed person does not have the right to
 confront or cross-examin any witness but
 may submit questions for the witness prior to
 the hearing..."

   The committed person was not given this
opportunity to submit questions for the witness
due to the fact that NO EVIDENCE NOR STATEMENTS
MADE BY ANY WITNESSES WAS REVEALED PRIOR TO
THE HEARING.

   Therefore, committed person had no basis
or idea of what questions would have been
relevant or appropriate to submit. And,
it was for this very same reason that

the committed person explained to the adjustment committee that he is unable to defend himself against these charges without "some" or "any" evidence put before him.

Even though the DR states that a continuance was executed by the committee to garner such evidence — this continuation was not for the committed person's benefit, as he has still not ~~see~~ been shown any evidence.

The DR states that the committee reviewed some evidence; but that is prejudicial without the committed person being allowed to view and, if possible, explain such evidence.

Also, the DR stated that the evidence was "attached" to the report. It was not.

(4)    20 IL ADMIN CODE, 504.80 (L)(1) and 504-80(L)(i)(A)(ii) state that:

~~504.80 (L)(1) "A summary of oral and written statements and other evidence~~

504.80 (L) "A written record shall be prepared and signed by all committee members which contains:

(1) A summary of oral and written statements and other evidence presented.

(A) The committee may consider information from ~~the~~ a confidential source if:

(ii) The information is reliable.

PAGE 4

The committee did not provide a summary of the written statements alleged to have been written by, or directed by the committed person.

And, reliability of the confidential Informant was assumed to be established by the purported fact that his statements preceded information that was later found. This does not eliminate the probability that the informant had manufactured the evidence or obtained such evidence prior to his statements being made. It also does not exclude the probability that such evidence was already known to outside agencies prior to the confidential source's statements. And, since the outside agents told committed person that the investigation had commenced as early as January, 2005 — there is a strong possibility that the confidential informant was told about the alleged evidence prior to his statements.

None of these facts were presented to the committee nor contained in the summary report. Neither was it revealed the motivations of the confidential source to make any statements at all.

For the aforementioned procedural errors and substantive errors, ticket # 200503375/1-PON should be declared VOID and should be either

expunged, or a new ticket with proper charges filed and evidence properly presented to the committed person prior to a new hearing being conducted.

Additional errors noted include the restriction of Recreation for a period of 365 days. But, this is in violation of 20 IL ADMIN CODE, chapter I, Section 504-B, subchapter (e) which limits the maximum Recreational restriction to 90 days.

Relief Requested: Committed Person requests that ticket #200503375/1-PON be expunged and that Committed Person be returned to South PC cell house with all privileges restored. Or,
In the alternative, a new ticket be issued to committed person containing proper charges that are substantiated with evidence. And, that such evidence be made available to committed person so that he, too, may properly defend himself and answer the ticket before the committee.

**E-FILED**
Thursday, 31 August, 2006  01:46:55 PM
Clerk, U.S. District Court, ILCD



| **Grievance Officer's Report** |

**Date Received:** August 17, 2005    **Date of Review:** October 3, 2005    **Grievance #** (optional): 041097

**Committed Person:** Mark Winger    **ID#:** K97120

**Nature of Grievance:** Disciplinary Report Written by C/O Vilt of Intel unit for Solicitation of Violent Assault of Any Person, Intimidation or Threats, Dangerous Communications and Violating State or Federal Laws on 7/11/05

**Facts Reviewed:** Offender Winger K97120 is grieving Disciplinary Report Written by C/O Vilt of Intel unit for Solicitation of Violent Assault of Any Person, Intimidation or Threats, Dangerous Communications and Violating State or Federal Laws on 7/11/05. Per OTS Offender Winger was placed on Investigation Status on 6/17/05 and was moved to an area of confinement in North house segregation unit. Offender Winger received notification of Investigation Status on 6/18/05 for which he signed for. On 7/11/05 offender Winger received Disciplinary report written by C/O Vilt. Hearing officer reviewed the ticket on 7/12/05 and scheduled a hearing with the Adjustment Committee on 7/18/05. Hearing was held on 7/18/05 and offender Winger was present and afforded the opportunity to address the charges. Offender Winger pled not guilty to charges and was granted a continuance to further gather evidence. Adjustment Committee held another hearing on 7/21/05 and offender Winger was present as record of Proceedings indicate. Offender Winger pled not guilty to charges and further noted he saw no evidence, acknowleged investigation by outside investigators and cited statutes for law enforcement to provide him cause/substantiation of charges as summarization of record of proceedings indicate. Also available to the Adjustment Committee at the hearing was physical evidence form outside investigation and comparison of handwriting from offender Wingers Master File for analysis. Information provided from a reliable, confidential source that is unnamed due to the safety and security  institution was reviewed. Adjustment Committee contacted Intel officer Vilt to confirm information was correct and true to the best of his knowledge. Basis for decision contains sufficient rationale for guilty finding based on physical evidence presented at the hearing, information provided by confidential sources available at the hearing, information from joint investigations by IDOC employees and outside law enforcement agencies and handwriting analysis that offender Winger instructed a party to kidnap and murder a witness, the kidnapping of a third party for collecting a ransom for the kidnapping/ murder of the aforementioned witness,that offender Winger solicitated an individual to kidnap a key witness in his original trial to recant testimony that was provided to authorities. Positive identification made by state id card. Discipline recommended by Adjustment Committee on 7/21/05 is within established guidelines of DR 504A to which the CAO's designee concurred on 7/22/05. Offender was notified of the results of the hearing on 8/2/05.

**Recommendation:** Based on a review of the Offender Disciplinary Report, the Adjustment Committees final summary that documents the record of proceedings and the basis for the decision containing sufficient rationale for discipline recommended and imposed all meet the guidelines established by DR 504A grievance is denied.

WESLEY G. WILES
Print Grievance Officer's Name    Grievance Officer's Signature

(Attach a copy of Committed Person's Grievance, including counselor's response if applicable)

| **Chief Administrative Officer's Response** |

**Date Received:** 10-6-05    ☐ Concur    ☐ I do not concur    ☐ Remand

**Comments:**

Chief Administrative Officer's Signature    10-7-05

| **Committed Person's Appeal To The Director** |

I am appealing the Chief Administrative Officer's decision to the Director.  I understand this appeal must be submitted within 30 days after the date of the Chief Administrative Officer's decision to the Administrative Review Board, P.O. Box 19277, Springfield, IL 62794-9277. (Attach a complete copy of the original grievance, including the counselor's response, if applicable, and any pertinent documents.)

Committed Person's Signature    ID#    Date

E-FILED
Thursday, 31 August, 2006  01:47:03 PM
Clerk, U.S. District Court, ILCD



DEAR ADMINISTRATION REVIEW BOARD,          10-14-05

On Friday, 10-14-05 I received a copy of the Adjustment Committee's response to my grievance of August 16th, 2005 which disputed the ticket and punishment received on July 11th, 2005. (All copies attached hereto).

The Adjustment Committee's response is procedurally defective and factually false, where it claims that:

(1)   On 7/18/05 Offender Winger was granted a continuance to further gather evidence

(2)   The Adjustment Committee held another hearing on 7/21/05 and offender Winger was present as record of indicates.

(3)   Offender Winger entered a second plea at the re-hearing on 7/21/05.

(4)   That information was provided as evidence to show that offender Winger instructed another person in writing to kidnap and murder another individual or to kidnap a third party to finance the aforementioned kidnap/murder.

Page 2

Offender Winger claims that:

(1)    Offender never requested a continuance on
7/18/05 and simply told the adjustment
committee that no evidence had been
provided to substantiate their accusations.

(2)    Offender Winger was never instructed that
a continuance had been granted to gather
information.

(3)    Offender Winger WAS NOT PRESENT at
the 7/21/05 hearing nor informed that
one would be held.

(4)    Any records indicating that Winger was
present at the 7/21/05 re-hearing are false
documents.

(5)    Winger did not enter a second plea at
the 2nd hearing held (allegedly) on 7/21/05
because he was not even present.

(6)    Offender Winger has not been furnished
with any evidence as of this writing
to indicate, or attempt to indicate, that

Page 3

any of the allegations are valid.

Furthermore, Offender Winger states that there do not exist, nor have there ever existed documents written by Winger which instruct, command, request, or encourage one person to commit murder of another person.

The original grievance, in addition to the points made here, is still meritous and correct.

Offender Winger would like to highlight to the Administrative Review Board that statements made by the adjustment committee in their narrative to the grievance are FALSE STATEMENTS.

I request immediate release from segregation, or in the alternative, the relief requested in the grievance.

Respectfully,

Mark Winger K97120

E-FILED
Thursday, 31 August, 2006  01:47:11 PM
Clerk, U.S. District Court, ILCD

DEFENDANT'S
EXHIBIT
F
ALL-STATE LEGAL®

4-15-06

Dear Counselor Smith,

I have 3 issues to bring to your immediate attention; two of which we have discussed several times over the last 4 or 5 months.

First Item: I am becoming emotionally and physically ill. I have been denied outside yard since June 17th, 2005.

I've grieved it all the way to the director's office. I asked Dr. Angus' assistance/intervention in January 2006 and again in March of 2006. He said he spoke to the house Lieutenants, but they apparently could not give me yard time.

Furthermore, I wrote Dr. Angus a kite and requested consultation on account of my increasing depression and possible panic attacks. He did not schedule me an appointment. I told you about this on 4-12-06 and you said you would speak to him. I don't know if that's been done — but I am still on my own.

Next Item: The ARB has not answered my grievance yet. I had a video conference on 12-14-2005 with Mrs. Benton and

Page 2 of 3

She assured me she would get back to me with a ruling in one week. That was _Four Months Ago!_ In the meantime, she has not responded to your requests for a "status" on my ticket. And, you were in apparent agreement with me that she was probably directed not to answer my grievance on account of my pending charges.

In the meantime, my emotional condition is getting worse. I am doing all I can on my own to stay healthy and sane — but, this place is a constant, non-stop insane asylum.

Last Item: Due to my new charges, I've used a great deal of writing paper and I don't expect that to diminish any time soon.

I am on commissary denial, as you know. You also know that, besides my current ticket, I have never had any other ticket. Yet, they will not approve removing my commissary denial. I NEED PAPER TO CONTINUE MY LEGAL REMEDIES. THE FEAR OF RUNNING OUT IS ADDING TO MY EMOTIONAL DISTRESS. I NEED PERMISSION TO DO A SPECIAL SHOP SO THAT I CAN PURCHASE SOME PAPER AND PENS AND LEGAL ENVELOPES. PLEASE HELP ME.

page 2 of 3

Other than these items, I continue to do my best to stay healthy, and to be respectful towards my care takers.

I look forward to any relief you can get for me.

Sincerely,

Mark Winger
K97100
HU: E-1005

cc: Self

E-FILED
Thursday, 31 August, 2006  01:47:18 PM
Clerk, U.S. District Court, ILCD



NAME: WINGER              NUMBER: K97120          CELL: E1005

## ADJUSTMENT COMMITTEE RECAP OF
## REQUESTED SEGREGATION TIME CUT

The Adjustment Committee reviewed a request for a segregation time cut for you in accordance with Departmental Rule 504A, Section 504.120.

The Adjustment Committee DENIED this request – based on the following reason(s):

☐ Repeat Offender                      ☐ Under Investigation
☐ Staff Assault                        ☐ Pending Prosecution
☒ Nature of Offense                    ☐ Recent Disciplinary Report
☐ Additional Observation Needed

Following this action your segregation release date is 6/17/06. The Warden/designee reviewed the Adjustment Committee's recommendation on 5/2/06 and affirmed this decision.

Clinical Services Dept.

cc: Inmate Master File K97120

**Illinois**
Department of
**Corrections**

**Rod R. Blagojevich**
Governor

**Roger E. Walker Jr.**
Director

Pontiac Correctional Center / 700 W. Lincoln Street / P.O. Box 99 / Pontiac, IL  61764 / Telephone: (815) 842-2816 / TDD: (800) 526-0844

## MEMORANDUM

**DATE:**      February 3, 2006

**TO:**         K97120   E1020
                Mark Winger

**FROM:**      Pontiac Correctional Center
                Record Office

## SUBJECT:   RESTORATION OF GRADE

On 2/1/06 you were reviewed for Restoration of Grade and denied by the Warden.


cc:     Master File



**Illinois**
Department of
**Corrections**

**Rod R. Blagojevich**
Governor

**Roger E. Walker Jr.**
Director

Pontiac Correctional Center / 700 W. Lincoln Street / P.O. Box 99 / Pontiac, IL 61764 / Telephone: (815) 842-2816 / TDD: (800) 526-0844

## MEMORANDUM

**DATE:**    May 3, 2006

**TO:**    K97120  E1005
Mark Winger

**FROM:**    Pontiac Correctional Center
Record Office

**SUBJECT:    RESTORATION OF GRADE**

On 5/2/06 you were reviewed for Restoration of Grade and denied by the Warden.


cc:    Master File

**E-FILED**
Thursday, 31 August, 2006 01:47:26 PM
Clerk, U.S. District Court, ILCD



Adjustment Committee. The factors listed in Section 504.20(b) shall be considered when making this determination.

1) If approved by the Chief Administrative Officer, a hearing before the Adjustment Committee shall commence within 14 days for adult offenders or 7 days for juvenile offenders after the approval, whenever possible.

2) If not approved, the disciplinary report shall be referred back for a hearing before the Program Unit which shall commence within 14 days for adult offenders or 7 days for juvenile offenders after the decision not to approve the recommendation, whenever possible.

i) The Program Unit Hearing Officer may recommend any of the actions authorized in Section 504.80(k) of this Part except that the Officer may not recommend placement in segregation or confinement, revocation of good time, revocation of transition center status, delay in referral of a juvenile offender to the Prisoner Review Board for recommended parole, an increase in the offender's security classification, or transfer to another correctional facility.

j) A record shall be signed by the Hearing Officer that contains a summary of oral and written statements and other evidence presented, the decision, and the disciplinary action recommended.

k) The summary shall be processed in accordance with Sections 504.80 (o) and (p) and 504.90 of this Part.

(Source: Amended at 27 Ill. Reg. 6214, effective May 1, 2003)

### Section 504.110 Computation of Discipline for Multiple Offenses

a) When an offender has been found in violation of more than one offense arising from a single incident, the maximum penalty shall not exceed the maximum penalty for the most serious offense the individual is found to have committed.

b) When an offender has been found in violation of more than one offense arising from separate incidents, the maximum penalty for each offense may be imposed, and such penalties shall run consecutively. For example, an offender who is found guilty of assaulting several persons within a short period of time has committed multiple offenses that would be punishable consecutively.

(Source: Amended at 27 Ill. Reg. 6214, effective May 1, 2003)

Adjustment Committee. The factors listed in Section 504.20(b) shall be considered when making this determination.

1) If approved by the Chief Administrative Officer, a hearing before the Adjustment Committee shall commence within 14 days for adult offenders or 7 days for juvenile offenders after the approval, whenever possible.

2) If not approved, the disciplinary report shall be referred back for a hearing before the Program Unit which shall commence within 14 days for adult offenders or 7 days for juvenile offenders after the decision not to approve the recommendation, whenever possible.

i) The Program Unit Hearing Officer may recommend any of the actions authorized in Section 504.80(k) of this Part except that the Officer may not recommend placement in segregation or confinement, revocation of good time, revocation of transition center status, delay in referral of a juvenile offender to the Prisoner Review Board for recommended parole, an increase in the offender's security classification, or transfer to another correctional facility.

j) A record shall be signed by the Hearing Officer that contains a summary of oral and written statements and other evidence presented, the decision, and the disciplinary action recommended.

k) The summary shall be processed in accordance with Sections 504.80 (o) and (p) and 504.90 of this Part.

(Source: Amended at 27 Ill. Reg. 6214, effective May 1, 2003)

### Section 504.110 Computation of Discipline for Multiple Offenses

a) When an offender has been found in violation of more than one offense arising from a single incident, the maximum penalty shall not exceed the maximum penalty for the most serious offense the individual is found to have committed.

b) When an offender has been found in violation of more than one offense arising from separate incidents, the maximum penalty for each offense may be imposed, and such penalties shall run consecutively. For example, an offender who is found guilty of assaulting several persons within a short period of time has committed multiple offenses that would be punishable consecutively.

(Source: Amended at 27 Ill. Reg. 6214, effective May 1, 2003)

### Section 504.TABLE A  Maximum Penalties for Adult Offenders

| Offense | Maximum Penalties for Adult Offenders | | | |
|---|---|---|---|---|
| | Loss or Restriction of Privileges | B or C Grade | Good Time Revocation | Segregation |
| 100.  Violent Assault of any Person | 1 year | 1 year | 1 year | Indeterminate |
| 101.  Arson | 1 year | 1 year | 1 year | 1 year |
| 102.  Assaulting any Person | 1 year | 1 year | 1 year | 1 year |
| 103.  Bribery & Extortion | 1 year | 1 year | 1 year | 1 year |
| 104.  Dangerous Contraband | 1 year | 1 year | 1 year | 1 year |
| 105.  Dangerous Disturbance | 1 year | 1 year | 1 year | 1 year |
| 106.  Escape or Runaway | 1 year | 1 year | 1 year | 1 year |
| 107   Sexual Misconduct | 1 year | 1 year | 1 year | 1 year |
| 108.  Sexual Assault | 1 year | 1 year | 1 year | Indeterminate |
| 109.  Electronic Contraband | 1 year | 1 year | 1 year | 1 year |
| 110.  Impeding or Interfering with an Investigation | 1 year | 1 year | 1 year | 1 year |
| 201.  Concealment of Identity | 6 months | 6 months | 6 months | 6 months |
| 202.  Damage or Misuse of Property | 6 months | 6 months | 6 months | 6 months |
| 203.  Drugs and Drug Paraphernalia | 6 months | 6 months | 6 months | 6 months |
| 204.  Forgery | 4 months | 4 months | 4 months | 4 months |
| 205.  Security Threat Group or Unauthorized Organizational Activity | 1 year | 1 year | 1 year | 1 year |
| 206.  Intimidation or Threats | 6 months | 6 months | 6 months | 6 months |
| 207.  Possession of Money | 6 months | 6 months | 6 months | 6 months |
| 208.  Dangerous Communications | 6 months | 6 months | 6 months | 6 months |
| 209.  Dangerous Written Material | 6 months | 6 months | 6 months | 6 months |

<u>20 ILLINOIS ADMINISTRATIVE CODE    CH. I, SEC.504</u>
SUBCHAPTER e

| Offense | Maximum Penalties for Adult Offenders | | | |
|---|---|---|---|---|
| | Loss or Restriction of Privileges | B or C Grade | Good Time Revocation | Segregation |
| 210. Impairment of Surveillance | 6 months | 6 months | 6 months | 6 months |
| 211. Possession or Solicitation of Unauthorized Personal Information | 6 months | 6 months | 6 months | 6 months |
| 212. Frivolous Lawsuit | 0 days | 0 days | 6 months | 0 days |
| 213. Failure To Reveal Assets | 6 months | 6 months | 6 months | 6 months |
| 301. Fighting | 1 month | 1 month | 1 month | 1 month |
| 302. Gambling | 2 months | 2 months | 1 month | 1 month |
| 303. Giving False Information to an Employee | 3 months | 3 months | 3 months | 3 months |
| 304. Insolence | 3 months | 3 months | 1 month | 1 month |
| 305. Theft | 6 months | 6 months | 3 months | 3 months |
| 306. Transfer of Funds | 3 months | 3 months | 3 months | 3 months |
| 307. Unauthorized Movement | 2 months | 2 months | 2 months | 2 months |
| 308. Contraband or Unauthorized Property | 3 months | 3 months | 3 months | 3 months |
| 309. Petitions, Postings, and Business Ventures | 6 months | 6 months | 3 months | 3 months |
| 310. Abuse of Privileges | 3 months | 3 months | 3 months | 3 months |
| 311. Failure to Submit to Medical or Forensic Tests | 3 months | 3 months | 3 months | 3 months |
| 402. Health, Smoking, or Safety Violations | 3 months | 3 months | 3 months | 3 months |
| 403. Disobeying a Direct Order | 3 months | 3 months | 3 months | 3 months |
| 404. Violation of Rules | 1 month | 1 month | 1 month | 1 month |
| 405. Failure to Report | 1 month | 1 month | 1 month | 1 month |
| 406. Trading or Trafficking | 2 months | 2 months | 1 month | 1 month |

| Offense | Maximum Penalties for Adult Offenders | | | |
| --- | --- | --- | --- | --- |
| | Loss or Restriction of Privileges | B or C Grade | Good Time Revocation | Segregation |
| 501. Violating State or Federal Laws | 1 year | 1 year | 1 year | 1 year |
| 601. Aiding and Abetting, Attempt, Solicitation, or Conspiracy | Same as underlying offense | Same as underlying offense | Same as underlying offense | Same as underlying offense |

(Source: Amended at 27 Ill. Reg. 6214, effective May 1, 2003)

## SUBPART B: ADMINISTRATION OF DISCIPLINE – JUVENILE

**Section 504.200  Applicability (Repealed)**

(Source: Amended at 27 Ill. Reg. 6214, effective May 1, 2003)

**Section 504.202  Definitions (Repealed)**

(Source: Amended at 27 Ill. Reg. 6214, effective May 1, 2003)

**Section 504.205  Responsibilities (Repealed)**

(Source: Amended at 27 Ill. Reg. 6214, effective May 1, 2003)

**Section 504.210  Offenses and Maximum Penalties (Repealed)**

(Source: Amended at 27 Ill. Reg. 6214, effective May 1, 2003)

**Section 504.220  Preparation of Disciplinary Reports (Repealed)**

(Source: Amended at 27 Ill. Reg. 6214, effective May 1, 2003)

**Section 504.230  Temporary Confinement (Repealed)**

(Source: Amended at 27 Ill. Reg. 6214, effective May 1, 2003)

**Section 504.240  Review of Disciplinary Reports (Repealed)**

(Source: Amended at 27 Ill. Reg. 6214, effective May 1, 2003)

### Section 504.940 Appeals

a)    The releasee may, if not satisfied with the results of the grievance, submit a written appeal within 30 days after the date of the decision to:

> Director
> Department of Corrections
> 1301 Concordia Court, P.O. Box 19277
> Springfield, Illinois 62794-9277

b)    The Director shall review the grievance and submit a written response to the releasee within 6 months after receipt of the appealed grievance, where reasonably feasible under the circumstances.

(Source: Amended at 25 Ill. Reg. 10775, effective September 1, 2001)

### Section 504. APPENDIX A  Offense Numbers and Definitions

100.    VIOLENT ASSAULT OF ANY PERSON

Causing a person or an object to come into contact with another person in a deadly manner or in a manner that results in or is likely to result in serious bodily injury.

101.    ARSON

Setting fire in any location whether public or private, including, but not limited to, any part of the facility, its grounds, or State vehicles.

102.    ASSAULTING ANY PERSON

Causing a person, substances, or an object to come into contact with another person in an offensive, provocative, or injurious manner or fighting with a weapon.

103.    BRIBERY & EXTORTION

Demanding or receiving anything of value in exchange for protection, to avoid bodily injury, or through duress or pressure. Giving or receiving money or anything of value to violate State or federal law or to commit any act prohibited under this Part.

104.    DANGEROUS CONTRABAND

Possessing, manufacturing, introducing, selling, supplying to others, or using without authorization any explosive, acid, caustic material for incendiary devices, ammunition, dangerous chemical, escape material, knife, sharpened instrument, gun, firearm, razor, glass, bludgeon, brass knuckles, cutting tools, tools which may be used to defeat security measures such as hacksaw blades, keys, and lock picks, any other dangerous or deadly

weapon or substance of like character, or any object or instrument that is made to appear to be or could be used as a deadly or dangerous weapon or substance.

105.    DANGEROUS DISTURBANCES

Causing, directing, or participating in any action or group activity that may seriously disrupt activities or endanger the facility, persons, or property, including the taking or holding of hostages by force or threat of force and engaging in prohibited group activities such as work stoppages or hunger strikes.

106.    ESCAPE OR RUNAWAY

For escape of a felon or runaway of a juvenile delinquent, leaving or failing to return to lawful custody without authorization, including the failure to return from furlough, leave, or authorized absence within 2 hours after the designated time.

107.    SEXUAL MISCONDUCT

Engaging in sexual intercourse, sexual conduct, or gesturing, fondling, or touching done to sexually arouse, intimidate, or harass either or both persons; or engaging in any of these activities with an animal.

108.    SEXUAL ASSAULT

Causing unwilling contact between the sex organ of one person and the sex organ, mouth, or anus of another person or any intrusion of any part of the body of one person or object into the sex organ or anus of another person by use of force or threat of force, including pressure, threats, or any other actions or communications by one or more persons to force another person to engage in a partial or complete sexual act.

109.    ELECTRONIC CONTRABAND

Possessing, selling, receiving, supplying to others, or using without authorization any electronic device, video recording device, computer, or cellular communications equipment, including, but not limited to, cellular telephones, cellular telephone batteries, pagers, computers, and computer peripheral equipment.

110.    IMPEDING OR INTERFERING WITH AN INVESTIGATION

Obstructing, impeding, or refusing to provide information relevant to an investigation.

201.    CONCEALMENT OF IDENTITY

Wearing a disguise or a mask, impersonating another, or otherwise concealing one's identity.

202.    DAMAGE OR MISUSE OF PROPERTY

Destroying, damaging, removing, altering, tampering with, or otherwise misusing property belonging to the State, another person, or entity, including the obstruction of locks or security devices, destroying or tampering with bar codes or identification cards, or the use of another person's identification card.

203.    DRUGS AND DRUG PARAPHERNALIA

Possessing, manufacturing, introducing, selling, supplying to others, or receiving alcohol, any intoxicant, inhalant, narcotic, syringe, needle, controlled substance, or marijuana; or being under the influence of any of the above substances; or refusing to be tested for drug or alcohol use, including failure to provide a specimen within 2 hours after the request; or destroying or tampering with drug or alcohol tests or testing equipment. This offense includes medication misuse, for example, the possession or use of unauthorized amounts of prescribed medication, or selling or supplying prescribed medication to others.

204.    FORGERY

Forging, counterfeiting, or reproducing without authorization any document, article of identification, money, security, or official paper.

205.    SECURITY THREAT GROUP OR UNAUTHORIZED ORGANIZATIONAL ACTIVITY

Engaging, pressuring, or authorizing others to engage in security threat group or unauthorized organizational activities, meetings, or criminal acts; displaying, wearing, possessing, or using security threat group or unauthorized organizational insignia or materials; or giving security threat group or unauthorized organizational signs. Unauthorized organizational activity shall include engaging in the above activities by or on behalf of an organization that has not been approved pursuant to 20 Ill. Adm. Code 445 or 450.

206.    INTIMIDATION OR THREATS

Expressing by words, actions, or other behavior an intent to injure any person or property that creates the reasonable belief that physical, monetary, or economic harm to that person or to another will result.

207.    POSSESSION OF MONEY

Possessing or causing to be brought into the facility any coin, currency, or other negotiable instrument without authorization or for residents of transition centers, failure

to promptly submit all income to center staff including wages, tips, gifts, or any check for social security, disability, veteran's benefits, grants, scholarships, or loans.

208. DANGEROUS COMMUNICATIONS

Engaging in verbal or written communication that is likely to encourage violence against persons or that is likely to disrupt or endanger the safety and security of the facility, including, but not limited to, escape plans and manufacture of weapons.

209. DANGEROUS WRITTEN MATERIAL

Possessing or causing to be brought into the facility written material that presents a serious threat to the safety and security of persons or the facility, including, but not limited to, written material relating to methods of escape and the manufacture of weapons.

210. IMPAIRMENT OF SURVEILLANCE

Using curtains, coverings, or any other matter or object in an unauthorized manner that obstructs or otherwise impairs the line of vision into an offender's cell or room or which obstructs or otherwise impairs any viewing panel or surveillance equipment, both audio and visual, within the facility.

211. POSSESSION OR SOLICITATION OF UNAUTHORIZED PERSONAL INFORMATION

Possessing or soliciting unauthorized personal information regarding another offender, releasee, employee, or former employee, including, but not limited to, personnel files, master files, medical or mental health records, photographs, social security numbers, home addresses, financial information, or telephone numbers except as authorized by a court order or as approved in writing by the Chief Administrative Officer.

212. FRIVOLOUS LAWSUIT

A pleading, motion, or other paper filed by the offender for which the court, in accordance with 730 ILCS 5/3-6-3, has found to be frivolous.

213. FAILURE TO REVEAL ASSETS

For adult offenders and juvenile offenders tried as adults, failing to fully cooperate in revealing financial assets on the form provided, including tangible and intangible property and real and personal property; providing false or inaccurate information regarding financial assets or dependants on the forms provided; or refusing to cooperate in revealing financial assets on the form provided.

301.  FIGHTING

Fighting with another person in a manner that is not likely to cause serious bodily injury to one or the other and that does not involve the use of a weapon.

302.  GAMBLING

Operating or playing a game of chance or skill for anything of value, making a bet upon the outcome of any event, or possessing any gambling device.  This shall include participating in any lottery.

303.  GIVING FALSE INFORMATION TO AN EMPLOYEE

Lying or knowingly providing false information to an employee, either orally or in writing.

304.  INSOLENCE

Talking, touching, gesturing, or other behavior that harasses, annoys, or shows disrespect.

305.  THEFT

Taking property belonging to another person or entity or the facility without the owner's authorization.

306.  TRANSFER OF FUNDS

Causing money to be transferred from one trust fund to another or through an outside source to the account of another offender or entering into contracts or credit agreements without written approval from the Chief Administrative Officer.

307.  UNAUTHORIZED MOVEMENT

Being anywhere without authorization or being absent from where required to be or returning late or not traveling directly to or from any authorized destination without prior staff approval.

308.  CONTRABAND OR UNAUTHORIZED PROPERTY

Possessing, giving, loaning, receiving, or using property that an offender has no authorization to have or to receive and that was not issued to the individual through regular procedures, including the unauthorized possession of food or clothing or the possession of property in excess of that which is authorized by the facility; or property that has been altered from its original state.

309.  PETITIONS, POSTINGS, AND BUSINESS VENTURES

Writing, signing, or circulating a petition without authorization; unauthorized distributing
or posting of any printed or written materials, including surveys; engaging in an
unauthorized business venture; or representing oneself as a corporation or official of a
corporation without authorization.

310.  ABUSE OF PRIVILEGES

Violating any rule regarding visits, mail, the library, yard, commissary, telephone, or
recreational activities. This includes corresponding or communicating with a victim, a
victim's family member, or any other person after the offender has received notice that
such person has informed the Department that he or she does not wish to receive
correspondence from the offender. However, if the conduct also constitutes a violation of
federal or State law, a committed person may also be charged under #501.

311.  FAILURE TO SUBMIT TO MEDICAL OR FORENSIC TESTS

Willfully refusing to submit to, or cooperate with, testing, examinations, or the provision
of samples required by court order, State law, or current standards of public health and
safety, including the refusal to submit to annual tuberculosis screening and mandatory
HIV or DNA testing.

402.  HEALTH, SMOKING, OR SAFETY VIOLATIONS

Smoking in an unauthorized area; tattooing or body piercing, including, but not limited
to, piercing of the ear, nose, or lip; or disregarding basic hygiene of any person, cell,
living or work area, or other place in the facility or its grounds.

403.  DISOBEYING A DIRECT ORDER

Willfully refusing or neglecting to comply with an order, including the refusal to
participate in educational testing; to accept a work, educational, or housing assignment;
or to perform a work assignment.

404.  VIOLATION OF RULES

Willfully disobeying any rule of the facility. If the specific offense is stated elsewhere in
this Part, a committed person may not be charged with this offense. The rule violated
must be specified in the disciplinary report.

405.  FAILURE TO REPORT

Failure to report for a work, educational, or program assignment or for transport.

406.    TRADING OR TRAFFICKING

Trading or trafficking with any person.

501.    VIOLATING STATE OR FEDERAL LAWS

Committing any act that would constitute a violation of State or federal law. If the specific offense is stated elsewhere in this Part, an offender may not be charged with this offense except as otherwise provided in this Section. The State or federal offense must be specified in the disciplinary report.

601.    AIDING AND ABETTING, ATTEMPT, SOLICITATION, OR CONSPIRACY

Aiding and abetting any person in the commission of any of these offenses; attempting to commit any of these offenses; making plans to commit any of these offenses; soliciting another to commit any of these offenses; or conspiring to commit any of these offenses shall be considered the same as the commission of the offense itself and shall carry the penalty prescribed for the underlying offense.

(Source: Amended at 27 Ill. Reg. 6214, effective May 1, 2003)

E-FILED
Thursday, 31 August, 2006  01:47:34 PM
Clerk, U.S. District Court, ILCD

ALL-STATE LEGAL®  DEFENDANT'S
EXHIBIT
I-1

Page 1 of 2

Westlaw.

20 IL. ADC 504.670

20 Ill. Adm. Code 504.670
Ill. Admin. Code tit. 20, § 504.670

c

**WEST'S ILLINOIS ADMINISTRATIVE CODE**
**TITLE 20. CORRECTIONS, CRIMINAL JUSTICE, AND LAW ENFORCEMENT**
**CHAPTER I: DEPARTMENT OF CORRECTIONS**
**SUBCHAPTER E: OPERATIONS**
**PART 504: DISCIPLINE AND GRIEVANCES**
**SUBPART D: SEGREGATION, INVESTIGATIVE CONFINEMENT AND ADMINISTRATIVE DETENTION – ADULT**

Current with amendments received through April 14, 2006.

504.670 Recreation for Persons in Segregation Status

a) The Chief Administrative Officer shall determine the number of hours a week offenders in segregation status may recreate outside their cells. Unless restricted by the Chief Administrative Officer in accordance with this Section:

1) Offenders in segregation status for less than 90 consecutive days shall be afforded the opportunity to recreate outside their cells for a minimum of one hour per week.

2) Offenders who have been in segregation status for 90 consecutive days or more shall be afforded the opportunity to recreate outside their cells for a minimum of five hours per week.

b) Unless medically contraindicated, out of cell recreation may be temporarily restricted or suspended if the Chief Administrative Officer determines the activity to be a threat to the safety and security of the facility or any person. For example:

1) Offenders who are in segregation status and who are also under investigation may have their recreational opportunities restricted during the pendency of the investigation for a period not to exceed 90 days.

2) Offenders may have their recreation restricted or limited due to a medical or mental health condition as determined necessary by a health care professional.

3) Offenders who have been witnesses in criminal cases against other offenders, who are informants, or who otherwise require precautions to ensure their protection may have their recreational opportunities restricted.

4) Offenders who are classified as high escape risks may have their recreational opportunities restricted

c) Offenders who are found guilty under 20 Ill. Adm. Code 504 Subpart A of:

1) A violation of State or federal laws, or committing assault, dangerous contraband, dangerous disturbance, escape, sexual misconduct, arson, damage or misuse of property, or aiding or abetting, attempting, soliciting, or conspiring to commit any of those offenses while in segregation status may be:

A) Restricted from recreational opportunities for up to 90 days for the first offense, and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

---

Page 2 of 2

20 IL. ADC 504.670

20 Ill. Adm. Code 504.670
Ill. Admin. Code tit. 20, § 504.670

B) Restricted from recreational opportunities for up to 90 days or indefinitely placed on limited recreation or both for the second and subsequent offenses.

2) Any other major rule infraction which is yard-related and which was committed while the offender was in segregation status may be restricted for up to 90 days for the first offense and up to 90 days for each subsequent major offense.

3) A minor disciplinary offense which is yard-related and which was committed while the offender was in segregation status may be restricted for up to 15 days for the first offense and up to 30 days for each subsequent offense.

d) The period of restriction imposed under subsection (c) of this Section shall be served consecutive to the initial 90-day placement in segregation status and consecutive to any previously imposed recreational restrictions. This shall not limit the ability to restrict recreational opportunities for offenders who have not served 90 consecutive days in segregation.

e) Restrictions on recreational opportunities shall be documented, including the types, length, and reason for the restriction. A copy of the documentation shall be maintained by the facility, a copy shall be placed in the offender's master record file, and a copy shall be given to the offender

f) Whenever an offender's recreation is restricted for more than 90 consecutive days, the restriction and any health concerns must be personally reviewed and approved in writing by an Assistant Chief Administrative Officer or above.

g) Offenders whose recreational opportunities have been restricted or limited may grieve the determination in accordance with 20 Ill. Adm. Code 504 Subpart F.

h) Recreational opportunities shall not be required during institutional lockdowns or during institutional emergencies, including, but not limited to, riots, strikes, fires, work stoppages, power outages, and natural disasters.

(Source: Amended at 27 Ill. Reg. 6214, effective May 01, 2003)
&lt;General Materials (GM) - References, Annotations, or Tables&gt;

20 ILAC § 504.670

20 IL. ADC 504.670
END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**E-FILED**
Thursday, 31 August, 2006  01:47:41 PM
Clerk, U.S. District Court, ILCD

EXHIBIT

I-2

Westlaw.

20 Ill. Adm. Code 504.850
Ill. Admin. Code tit. 20, § 504.850

C

### WEST'S ILLINOIS ADMINISTRATIVE CODE
### TITLE 20: CORRECTIONS, CRIMINAL JUSTICE, AND LAW ENFORCEMENT
### CHAPTER I: DEPARTMENT OF CORRECTIONS
### SUBCHAPTER E. OPERATIONS
### PART 504: DISCIPLINE AND GRIEVANCES
### SUBPART F: GRIEVANCE PROCEDURES FOR OFFENDERS

Current with amendments received through April 14, 2006.

504.850 Appeals

a) If, after receiving the response of the Chief Administrative Officer, the offender still feels that the problem, complaint or grievance has not been resolved to his or her satisfaction, he or she may appeal in writing to the Director within 30 days after the date of the decision. Copies of the Grievance Officer's report and the Chief Administrative Officer's decision should be attached.

b) The Director shall review the grievance and the responses of the Grievance Officer and Chief Administrative Officer and shall determine whether the grievance requires a hearing before the Administrative Review Board. If it is determined that the grievance is without merit or can be resolved without a hearing, the offender shall be advised of this disposition, in writing.

c) An Administrative Review Board shall be appointed by the Director. One member of the Board may be a citizen from the community. A Department member shall be designated as chairperson.

d) The Administrative Review Board shall meet as frequently as necessary and may schedule hearings on grievances. Hearings may be conducted in person or via video or telephonic conference. The Board may call witnesses or examine records at its discretion.

e) The Administrative Review Board shall submit to the Director a written report of its findings and recommendations.

f) The Director shall review the findings and recommendations of the Board and make a final determination of the grievance within 6 months after receipt of the appealed grievance, where reasonably feasible under the circumstances. The offender shall be sent a copy of the Director's decision.

g) In those instances where an offender is appealing a grievance determined by the Chief Administrative Officer to be of an emergency nature, the Administrative Review Board shall expedite processing of the grievance.

(Source: Amended at 27 Ill. Reg. 6214, effective May 01, 2003)
        <General Materials (GM) - References, Annotations, or Tables>

20 ILAC § 504.850

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

20 IL ADC 504.850                                                        Page 2

20 Ill. Adm. Code 504.850
Ill. Admin. Code tit. 20, § 504.850

**20 IL ADC 504.850**
END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**E-FILED**
Thursday, 31 August, 2006  01:47:49 PM
Clerk, U.S. District Court, ILCD



**ILLINOIS DEPARTMENT OF CORRECTIONS**
**HEARING OF ADMINISTRATIVE REVIEW BOARD**
**VIDEO CONFERENCE**

*DATE OF HEARING*: December 14, 2005

*INSTITUTION*: Pontiac Correctional Center, Pontiac, Illinois

*GRIEVANT NAME*: Mark Winger, Register No. K97120

*BOARD MEMBERS PRESENT*: Melody J. Ford, Administrative Review Board Chairperson, Office of Inmate Issues, Department of Corrections.

Grievant was personally interviewed by the Administrative Review Board. All information submitted to the Board by the Grievant, and the institution related to the issue being grieved, was reviewed. Issues warranting further action / consideration were discussed with the Pontiac Correctional Center administration.

Nature of Grievance: Inmate Winger is grieving a disciplinary report, 200503375, dated July 11, 2005 received at Pontiac Correctional Center.

Findings: The disciplinary report of July 11, 2005 regarding an incident which occurred on July 11, 2005 at 8:00 AM, was written by C/O Edward Vilt charging violation of DR504: 601-100-Solicitation of Violent Assault of Any Person, 206-Intimidation or Threats, 208-Dangerous Communication, 501-Violating State or Federal Laws, 720 ILCS 5/8-1.1, Solicitation of Murder and 720 ILCS 5/10-2 Aggravated kidnapping for Ransom. Inmate is charged with the following: As the result of an investigation, it has been determined that Offender Winger solicited an individual whose identity will remain confidential, to arrange for the kidnapping and murder of a witness from Offender Winger's original criminal trial. It is also verified through evidence collection that Offender Winger instructed the individual, both in verbal and written communication on how to proceed with the kidnapping and murder of the witness, as well as information on kidnapping a third party for the purpose of collecting a ransom to fund the kidnapping/murder of the witness. Physical evidence collected corroborates information provided by the confidential source that Offender Winger solicited an individual to kidnap the key witness in Winger's original criminal trial for the purpose of forcing the witness to recant information and testimony provided to authorities. Winger's specific instructions included staging the scene of the kidnapping to make it look as though the witness left on their own power, forcing the witness to produce a written, as well as an audio recantation of testimony provided, sending the recantation to a family member of Winger's, as well as Offender Winger's attorney, then killing the witness in a manner which would lead authorities to believe that it was a suicide. Evidence collected also substantiates the fact that Offender Winger's purpose for this to take place was to eliminate the witness in anticipation of receiving a new trial, therefore improving Offender Winger's chances of not being found guilty in the second trial. All physical evidence collected during the course of this investigation are not directly referenced in this disciplinary report for the purpose of maintaining the integrity of this investigation, the safety of the confidential informant, the security of the Institution, as well as any possible prosecution that may be imposed after a total review of all available facts and evidence the Jurisdictional Prosecuting Authority. Offender Winger has been positively identified by Inmate Identification Card, OTS, Institutional Graphics, and the Confidential Informant. The disciplinary report was served on July 11, 2005 at 6:30 PM.

The Adjustment Committee Hearing was conducted at Pontiac Correctional Center on July 18, 2005 at 9:51 AM. A continuance was granted per the offender's request. The Adjustment Committee Hearing was reconvened on July 21, 2005 at 2:00 PM. The Adjustment Committee found the Grievant guilty of 601.100, 206, 208, 501. The recommended disciplinary action was: 1 year C-grade, 1 year Segregation, 1 year Revocation Good Conduct Credits, 1 year Audio/Visual Restriction, 1 year Yard Restriction, 1 year Commissary Restriction, 1 year Contact Visits Restriction. CAO concurred on July 22, 2005.

Inmate's statement: Offender Winger stated he was called off the yard on June 17th to meet with the FBI and the State Police. He stated they gave him the information that was in the disciplinary report. He stated he went to the Adjustment Committee on July 18 and told them he could not defend himself because he hasn't seen any evidence. He stated the statutes do not fit the charges and that they do not have anything in writing from him. He stated he was in investigative status for 31 days. He stated he did not request a continuance and that the hearing was not continued. He stated he did not know how the confidential source could be reliable. He stated he was given a one year yard restriction, and that he could not be given more than 90 days. He stated there are procedural errors involving 501-Violation of State and Federal Laws. He stated he could not answer to the allegations. He stated there was no second hearing. He is asking for the charge of 501 (Murder) to be dropped. He stated the Aggravated Kidnapping charge has been dropped. He is asking for the other charges to be reviewed and the sanctions reduced. He is asking to be compensated for the yard restriction. He stated it is unfair to be in segregation and to be denied. He stated the Department is showing deliberate indifference by denying yard.

The Grievance officer's report, 41097, and subsequent recommendation dated October 3, 2005 and approved by the Chief Administrative Officer on October 7, 2005 have been reviewed.

The evidence regarding this report was discussed with Ed Vilt, Pontiac Correctional Center.

Recommendations: Based on a review of all information and a compliance check of the procedural due process safeguards outlined in Department Rule 504, the Board is reasonably certain you committed the offense and recommends the grievance be denied.

*FOR THE BOARD:*

Melody J. Ford
Administrative Review Board Chairperson
Office of Inmate Issues

*CONCURRED:*                                    January 9, 2006

Roger E. Walker, Jr.
Director

cc:   Warden Guy D. Pierce , Pontiac Correctional Center
      Mark Winger, Register No. K97120

**E-FILED**
Thursday, 31 August, 2006  01:47:56 PM
Clerk, U.S. District Court, ILCD



E:1005

PRIVILEGED



Illinois
Department of
Corrections

ADMINISTRATIVE REVIEW BOARD
1301 CONCORDIA COURT
P.O. BOX 19277
SPRINGFIELD, IL 62794-9277

**E-FILED**
Thursday, 31 August, 2006  01:48:03 PM
Clerk, U.S. District Court, ILCD



Now, comes Mark A. Winger who states under penalty of perjury that the following statement is true and accurate to the best of his recollection; and states the following:

1. Today, Sunday April 30th, 2006 at approximately 1:00 PM a C/o (name unknown) came to my cell (unexpectedly) and asked me if I was going to go to yard today.

2. I responded, "Am I allowed to go to yard?"

3. The C/o then said, "I'll take that as a no." and began to walk away.

4. I called him back and explained that I will go to yard, and that I only asked the question "am I allowed" on account of my 365 Day yard restriction.

5. The C/o acted as if he did not believe I had actually been given a 365 Day yard restriction. He put my name on his list to go to yard.

6. About 10 minutes later, C/o Kling and another C/o (name unknown) came to my cell to escort me to yard.

7. C/o Kling stated that he had told me nearly one month prior that there was a yard day once each month for people on yard restriction.

8. I said to Kling that at the time he told me about the yard for those on yard restriction he did not know what day that was, but would find out.

9. Kling denied saying that and responded that the yard day has always been the last Sunday of the month.

10. I told Kling that I remember the conversation differently and that counselor SMITH had told me that the reason Kling had

Said anything to me at all is because counselor SMITH had told Kling that there was a yard day for those on yard restriction, but that SMITH did not know when that was.

11. Kling denied that SMITH ever said anything to him about the matter.

12. Later, Kling told me that he remembered me telling him that I would not want to go to yard anyway.

13. I corrected Kling's false recollection by telling him that I had told him that when I was in <u>North House</u> from June 17th, 2005 to January 5th, 2006 I was told I could not go to yard. And, that it was probably a blessing in disguise being that the inmates in North house fling bodily waste on each other in the yard and that I'm not sure I wanted to step into a septic tank.

14. But, I reminded Kling that I had also told him that they [the prison staff] had not even offered me the opportunity to go to yard.

15. Until today, April 30th, 2006 I had not been asked if I wanted to go to yard at any time during my segregation.

16. I have never refused to go to yard.

17. It should be mentioned that I had complained about my yard denial and my need to have some exercise away from my cell to Dr. Angus on 1-6-06 and 3-31-06, and to Counselor SMITH on 1-30-06, 2-24-06, 3-20-06, ~~and~~ 4-12-06, and 4-27-06.

18. Also, Dr. ANGUS claimed to have spoken with the House Lieutenants after each of my complaints to him.

19.   Today's 1 Hour and 15 minutes of yard time was my first opportunity for away-from-my-cell exercise for 10½ months (since June 17th, 2005).

AFFIANT SAYETH NOTHING FURTHER.

I MARK WINGER, swear under penalty of perjury that the Afforementioned 19-paragraph statement is true and accurate to the best of my recollection.

_____ Affiant

April 30th, 2006

Mark A. Winger

E-FILED
Thursday, 31 August, 2006  01:48:09 PM
Clerk, U.S. District Court, ILCD

DEFENDANT'S
EXHIBIT

L

ALL-STATE LEGAL®

*April 30th, 2006*

Dear Counselor SMITH,

I was given the opportunity to go to yard today for roughly one hour. I am certain that occurred as a result of your efforts. Thank you.

I was also informed (TODAY) that a yard day for those on yard restriction always existed; the last Sunday of each month, but is being changed to the last Saturday of each month.

Be that as it may — I have never been offered yard at any time since June 17th, 2005 until today. One would think that for as long as I've been complaining about not being allowed to go to yard and to as many people as I've complained to and to the levels up and down the ~~chain~~ chain of command that has been aware of my complaint, I would have (or should have) been ~~offered~~ offered yard long before today.

I did enjoy the hour(s) yard time. However, shortly after returning to my cell I had a mild panick attack fearing that today's yard would be my last for another 10½ months. These panick attacks are a very odd thing. They make me think irrationally and yet know it's irrational, but yet it just seems to run away from me. I am afraid to say any more about them.

However, I believe that I need to get help from Dr. Angus or some other psychiatrist who may take my panick attacks (if that is what they are) more seriously.

I feel very strongly (and with good reason) that the development of these panicky feelings; my head aches; depression; etc, is a direct result of my deprivation from any activity away from my cell since June 12th, 2005.

I only hope it is not a perminent condition requiring a lifetime of psychotropic medications.

I can recall as early as November, 2005 when I went on sick call and Dr. Vade told me that I needed to get outside and exercise more on account of my high cholesterol and family history of heart disease. I had even explained to Dr. Vade that I'm not allowed out to yard. I recall the heaviness I felt for days after that, especially since my brother and father had just had heart surgery. I guess it is no wonder why I would increasingly become some kind of head case and get worked up to where I would think I was dying whenever I would think about my yard restriction and how unfair it was and how I needed — physically needed — yard time away from this cell.

As you can see — I still need to speak with Dr. Angus. I hope you can work the same kind of magic with him as you did with whomever you moved to give me yard time today.

Thanks,

Mark Winger K97120

cc: Self

E-FILED
Thursday, 31 August, 2006  01:48:17 PM
Clerk, U.S. District Court, ILCD



## AFFIDAVIT

Now, comes Mark A. WINGER, who states under penalty of purjury, that the following statement is true and accurate to the best of his recollection, and states the following:

1. On May 11th, 2006 I had a psychiatric medical session with Dr. Angus, who is the East House Segregation psychiatric doctor.

2. During the session I relayed to Dr. Angus the circumstances regarding my segregation, yard restriction and pending charges.

3. I explained to Dr. Angus the medical symptoms I have been experiencing, and which I claimed to believe were anxiety attacks.

4. Dr. Angus also believed that I may be experiencing anxiety attacks and based his conclusion by comparing my stated symptoms to his own personal experience.

5. Dr. Angus told me that once a person starts having anxiety attacks, they can never be cured of them, but can only manage the frequency

and severity of the anxiety attacks through medication and/or self stress relieving methods.

6.  I further explained to Dr. Angus why I believe my anxiety attacks and the onset of those attacks are a result of my prolonged deprivation from yard exercise.

7.  Dr. Angus stated that he had tried twice to help me get out to yard, but was unsuccessful in those attempts.

8.  Dr. Angus went on to admit that he was aware that I was finally permitted to go to yard after counselor Smith "pulled some strings" with Major Davidson, the East House Major.

9.  Dr. Angus agreed to continue to see me for the remainder of my segregation period, scheduled to end June 16th, 2006.

10.  Dr. Angus agreed to send me some literature on anxiety attacks and how to control them.

11.    During my medical session, Dr. Angus did not take any notes.

12.    Dr. Angus nearly fell asleep a half dozen times during my 20 minute session.

13.    I was Dr. Angus' last patient of the day.

FURTHER, AFFIANT SAYETH NOT.

I, Mark A. WINGER SWEAR UNDER PENALTY OF PURJURY THAT THE AFOREMENTIONED STATEMENTS WERE TRUE AND CORRECT TO THE BEST OF MY ABILITY TO RECALL.

_____
Affiant

MAY 11th, 2006
Date

Mark A. Winger
printed name

E-FILED
Thursday, 31 August, 2006  01:48:24 PM
Clerk, U.S. District Court, ILCD

ALL-STATE LEGAL®

DEFENDANT'S
EXHIBIT

N

## AFFIDAVIT

I, MARK A. WINGER STATE THE FOLLOWING AS TRUE AND ACCURATE UNDER PENALTY OF PERJURY THAT:

1. Today, May 16th, 2006 I was awakened by correctional officer Moore and told to pack up my cell.

2. C/o Moore stated that C/o Vilts wanted to speak with me and that I was being moved to North Segregation House for reasons unknown.

3. Mr. Vilts escorted me to his office and proceeded to ask me questions regarding my opinion of counselor Smith.

4. Mr. Vilts asked me what I had possibly told my family about Counselor Smith.

5. I did not recall telling my family anything specific at all, not even by name, about Counselor Smith.

6. Mr. Vilts then showed me a copy of a shipping document from Hershey's Chocolate to Counselor Smith.

7. The package did not identify the sender but had a printed message which read:
" Thank you for being so kind.
Re: Mark Winger "

8. I suggested to Mr. Vilts that perhaps an individual who routinely sends me hate mail may have sent the package.

9. Mr. Vilts doubted that idea claiming that that individual would not know who my Counselor was out of the many counselors whose stations periodically change.

10. I asked Mr. Vilts to call Hershey's on the phone while I was in his office.

11. Mr. Vilts did in fact call Hershey's in my presence and learned the identity of the sender.

12. Mr. Vilts stated that neither me nor any of my family were responsible.

13. Mr. Vilts stated that he was still going to move me to North House and had already received the Warden's approval to do so.

14. Mr. Vilts then proceeded to ask me questions about my complaints about being denied yard exercise.

15. I felt uncomfortable having to explain to him that I was denied yard.

16. Mr. Vilts pulled out a copy of the Adjustment Committee's Summary Report (Exhibit B-1 and B-2) and asked if that was the document which proscribed a 365 day total yard restriction.

17. I told Mr. Vilts in response, "No. But I have that report, too."

18. I also explained to Mr. Vilts that Dr. Angus had even told me that I received my first yard exercise after 319 days being denied yard time on account of "Counselor Smith pulling some strings with Major Davidson."

19. At that point, Mr. Vilts stated that I've always had yard opportunity and tried to pawn off the problem on my gallery officer.

20. At that point Mr. Vilts escorted me over to North Segregation House.

21. Further, affiant sayeth not.

The afforement statements were true and accurate to the best of my ability to recall.

Mark A. Winger
K97120
May 16th, 2006

**E-FILED**
Thursday, 31 August, 2006  01:48:30 PM
Clerk, U.S. District Court, ILCD



# AFFIDAVIT

Now comes Mark Winger, under penalty of perjury states the following is true and accurate:

1. Yesterday, on May 24th, 2006 I had a medical consultation with the in-house psychiatrist, Dr. Angus.

2. The session lasted for less than 20 minutes.

3. Dr. Angus was again visibly fatigued and appeared to be nearly falling asleep, just like the previous appointment.

4. Dr. Angus stated that he believes that my anxiety attacks may, in addition to my prolonged prohibition from yard exercise, be due to my pending charges.

5. I explained to Dr. Angus that my anxiety attacks pre-dated my charges by nearly six months.

6. Dr. Angus' unexpected diagnosis appeared to have been influenced by someone else, in light of the fact that Dr. Angus and I had not really discussed my charges pending prior to this date — nor, even during this consultation.

7. Dr. Angus ignored any opportunity to comment on whether or not he was responsible for sending the gift candy to counselor Smith, which resulted in me being falsely accused of doing it and caused the administration to move me from East segregation to the less favorable North House. (see Exhibit-N for further explaination.

8. The session did not address my anxiety attacks too much, however, Dr. Angus did promise to send me more litturature to help me relax.

9. Further, affiant sayeth not.

I swear that the aforementioned

statements are true and accurate to the
best of my ability to recall.

Mark A. Winger
K97120
May 25th, 2006

**E-FILED**
Thursday, 31 August, 2006  01:48:36 PM
Clerk, U.S. District Court, ILCD

Exhibit
P

## AFFIDAVIT

Now, comes Mark A. Winger, who states under oath that the following statements are true under the penalty of perjury, and says that:

1. On the morning of May 27th, 2006 I was in cell compliance and was waiting at my bars for morning count in order to tell the gallery officer that I wanted to go to yard.

2. May 27th, 2006 being the last Saturday of the month was allegedly the yard day for those on yard restriction.

3. When the gallery officer (C/O Small) came by for morning count I did in fact tell him that I wanted to go to yard.

4. C/O Small told me that today's yard was for those on yard restriction.

5. I informed C/O Small that I am in fact on yard restriction and would like to go to yard.

6. C/o Small responded, "Not according to my sheet.", and walked away.

7. Later, after my once per week shower I asked C/o Small how someone on yard restriction goes about getting himself on C/o Small's yard sheet.

8. C/o Small informed me that the yard restriction information comes off of my ticket and is placed on a large board in the Lietenant's office.

9. C/o Small further explained that the gallery officers have no control over who gets placed on the yard restriction board and that that information is provided down through the chain of command.

10. The other officer with C/o Small (name unknown) suggested that I try to go on regular yard day.

11. However, if I were to go to yard

on the regular yard day and were to get caught, I would then get a ticket for unauthorized movement. Therefore, his suggestion is not an option.

12.    It is clear from my interaction with C/O Small that:

(a) The gallery officers have no control over who gets to go to yard on the "yard restriction" yard day.

(b) The yard restriction information pertaining to how much yard a person who is on yard restriction gets, comes from the top.

(c)    It was never intended that I be given yard time, as Exhibit B-3 clearly states 365 days of total yard restriction.

13.    Further, affiant sayeth not.

I swear under penalty of perjury that the preceeding statement is true and accurate to the best of my ability to recall the events.

_____
Affiant Signature

MARK A. WINGER
Printed Name

K97120
Registration Number

MAY 27th, 2006
DATE

**E-FILED**
Thursday, 31 August, 2006  01:48:44 PM
Clerk, U.S. District Court, ILCD

Exhibit
Q

I was told by various Correctional Officers that, after the April 30th yard exercise, that my next yard time opportunity would be on May 27th, 2006.

On May 27th, 2006 I was dressed and ready by morning count time to go to yard. However, when I informed C/o Small that I wanted to go to yard, he said that I was not on the approved list to go to yard that day.

Later that same day, C/o Small told me that he went and double-checked the board and verified that I was not authorized for yard that day.

C/o Small further explained that the gallery officers have nothing to do with the determination of who goes to yard on yard days or yard restriction days. And, that such information is to be annotated on the status boards by the Lieutenants and Majors.

The purpose of this grievance is to document the continued denial of any yard activity from June 17th, 2005 to April 30th, 2006, and again from April 30th, 2006 to the present date.

There is really nothing that can be done at this point since my segregation time is due to expire in about 5 days, and that is prior to the next yard day for those on yard restriction.

I would like to add that, the May 27th, 2006 denial of yard is in keeping with my fear and supposition that the earlier April 30th, 2006 one hour of yard time was nothing more than a ruse by others to keep me from complaining any further.

I was told by various Correctional Officers that, after the April 30th yard exercise, that my next yard time opportunity would be on May 27th, 2006.

On May 27th, 2006 I was dressed and ready by morning count time to go to yard. However, when I informed C/O Small that I wanted to go to yard, he said that I was not on the approved list to go to yard that day.

Later that same day, C/O Small told me that he went and double checked the board and verified that I was not authorized for yard that day.

C/O Small further explained that the gallery officers have nothing to do with the determination of who goes to yard on yard days or yard restriction days. And, that such information is to be annotated on the status boards by the Lieutenants and Majors.

The purpose of this grievance is to document the continued denial of any yard activity from June 19th, 2005 to April 30th, 2006, and again from April 30th, 2006 to the present date.

There is really nothing that can be done at this point since my segregation time is due to expire in about 5 days; and that is prior to the next yard day for those on yard restriction.

I would like to add that, the May 30th, 2006 denial of yard is in keeping with my fear and supposition that the earlier April 30th, 2006 one hour of yard time was nothing more than a ruse by others to keep me from complaining any further.

**E-FILED**
Thursday, 31 August, 2006  01:48:52 PM
Clerk, U.S. District Court, ILCD

Exhibit
R-1

8-2-06

Dear Counselor Jones:

I am in receipt of your response to my grievance of June 28th, 2006 which addressed my question of my yard denial.

However, you did not answer my question, which was:

Did Tamms initiate the total yard denial or was my yard denial a total yard denial and carried over from Pontiac.

Would you please let me know?

Respectfully,

Winger K97130
C-5-7

Loss of Privilege follows You anywhere in the state! Review Your Last Disciplinary Report

8/3/06

E-FILED
Thursday, 31 August, 2006  01:49:01 PM
Clerk, U.S. District Court, ILCD

Exhibit
R-2

ILLINOIS DEPARTMENT OF CORRECTIONS
**OFFENDER'S GRIEVANCE**

| | | |
|---|---|---|
| Date: June 28th, 06 | Offender: (Please Print) Mark Winger | ID#: K97120 |
| Present Facility: Tamms Corr. Ctr. | Facility where grievance issue occurred: Tamms Corr. Ctr. | |

**NATURE OF GRIEVANCE:**

☐ Personal Property   ☐ Mail Handling   ☐ Restoration of Good Time   ☐ Disability
☐ Staff Conduct   ☐ Dietary   ☐ Medical Treatment   ☐ HIPAA
☐ Transfer Denial by Facility   ☐ Transfer Denial by Transfer Coordinator   ☒ Other (specify): Yard Denial

☐ Disciplinary Report: ____/____/____
                        Date of Report          Facility where issued

**Note:** Protective Custody Denials may be grieved immediately via the local administration on the protective custody status notification.

Complete: Attach a copy of any pertinent document (such as a Disciplinary Report, Shakedown Record, etc.) and send to:
    Counselor, unless the issue involves discipline, is deemed an emergency, or is subject to direct review by the Administrative Review Board.
    Grievance Officer, only if the issue involves discipline at the present facility or issue not resolved by Counselor.
    Chief Administrative Officer, only if EMERGENCY grievance.
    Administrative Review Board, only if the issue involves transfer denial by the Transfer Coordinator, protective custody, involuntary
    administration of psychotropic drugs, issues from another facility except personal property issues, or issues not resolved by the Chief
    Administrative Officer.

Brief Summary of Grievance: On Tuesday, June 27th, 2006 I asked C/O Russell if I would get yard that day. I had been told previously that I was level 1A with yard restriction but would get yard and showers on Tuesdays and Thursdays.
    C/O Russell and another gallery officer (name unknown) made every effort to assist me in determining if I would get yard and what my actual status was, as it was not showing up on the OTS.
    The officers later informed me (on Back)→

Relief Requested: Respectfully, I request that my yard restriction be removed immediately.

☐ Check only if this is an EMERGENCY grievance due to a substantial risk of imminent personal injury or other serious or irreparable harm to self.

_(signature)_   K97120   6 /28/06
Offender's Signature   ID#   Date
(Continue on reverse side if necessary)

---

**Counselor's Response (if applicable)**

Date Received: 6 /29 /06   ☒ Send directly to Grievance Officer   ☐ Outside jurisdiction of this facility. Send to Administrative Review Board, P.O. Box 19277, Springfield, IL 62794-9277

Response: OTS indicates 6/18/06 your level is 1A and the yard restriction ended 7/13/06.

C. Davis Kaust   _(signature)_   7 /27 /06
Print Counselor's Name   Counselor's Signature   Date of Response

---

**EMERGENCY REVIEW**

Date Received: ____/____/____   Is this determined to be of an emergency nature?   ☐ Yes; expedite emergency grievance
                                                                                ☐ No; an emergency is not substantiated.
                                                                                Offender should submit this grievance
                                                                                in the normal manner.

_____   ____/____/____
Chief Administrative Officer's Signature   Date

that I was indeed a level 1A with yard
restriction, but that the yard restriction was
a "total yard restriction". They also told me
that this "total yard restriction" followed me
from Pontiac and would expire on July 13th, 2006.
    Is there any other reason for me receiving
a total yard denial until 7-13-06 which is
being initiated by Tamms Correctional Center or
is the total yard restriction truly a carry-
over from Pontiac?
    Is my yard restriction a total yard
restriction or do I get at least some yard
before July 13th, 2006?
    I have made the mental health staff aware
of a serious medical condition which has developed
due to a prolonged deprivation of yard activity.